**BOULEVARD ASSOCIATES, a General Partnership, Plaintiff,**

v.

**SOVEREIGN HOTELS, INC., Daka, Inc., and Daka International, Inc., Defendants.**

**No. 90 Civ. 351 (TFGD).**

United States District Court, D. Connecticut.

April 7, 1994.

Cohen & Wolf, Frederick S. Gold, Daniel F. Wolf, for plaintiff.

Coyne & Gottlieb, John E. Coyne, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MOTLEY, District Judge (by designation).

This matter arises from a dispute concerning a commercial lease. Plaintiff Boulevard Associates seeks damages from defendant Sovereign Hotels for the willful breach of a commercial lease that the parties entered into in 1985. Plaintiff also seeks damages from defendant Daka, Inc. as a guarantor of Sovereign's liabilities under the lease. Finally, plaintiff seeks damages from defendant Daka International, Inc. for its tortious interference with the lease agreement.

The jurisdiction of this court is based on 28 U.S.C. § 1332(a)(1) because the parties are residents of different states and the amount in controversy exceeds $50,000. For the reasons stated below, this court finds that defendants are jointly and severally liable to plaintiff for their willful breach of the lease agreement and tortious interference with the relationship between plaintiff and Sovereign. Therefore, plaintiff is entitled to submit additional evidence to this court in support of its claim for damages.

## FACTS

Plaintiff Boulevard Associates ("Boulevard"), a Connecticut general partnership, owned certain land and improvements located at 225 Lordship Boulevard, Stratford, Connecticut. In April 1985, Boulevard entered into a commercial lease agreement with defendant Sovereign Hotels, Inc. ("Sovereign"), a Massachusetts corporation, whereby Boulevard agreed to build a hotel on the property that Sovereign would manage. Comp. ¶ 3, 4, 7 & 8.

Pursuant to the lease, Boulevard was responsible for obtaining the financing for the hotel and actually constructing the premises. In turn, Sovereign agreed to manage the property as a Best Western hotel. Comp. ¶ 12. Shortly after entering the lease, Boulevard obtained a construction mortgage loan from Union Trust Company ("UTC" or "Union Trust") in the amount of eight million dollars. Plaintiff, thereafter, tendered to UTC a construction monthly payment term loan note for eight million dollars which represented a first lien on the property. According to plaintiff, it used the entire proceeds from the mortgage to finance construction of the hotel in addition to investing over one million dollars of the partnership's funds. Comp. ¶¶ 15–16, Pl.'s Trial Memo Supp.Judg. Against All Def.'s, 6.

In return for Boulevard's promise to build the hotel, Sovereign agreed to pay "minimum rent," "additional rent," and "percentage rent" to plaintiff commencing upon the public opening of the hotel. The minimum rent consisted of the amount necessary to pay

principal and interest (i.e., "debt service") on the UTC mortgage. Thus, Sovereign was required to pay the entire debt service payments on the mortgage, regardless of whether the hotel generated sufficient revenues to cover the payments. Sovereign also agreed to pay additional rent which consisted of all taxes, assessments and government levies upon the property. Finally, the parties agreed that fifty percent (50%) of any excess cash flow from the property would be paid to Boulevard as percentage rents. Comp. ¶¶ 13(a)–(c).

Sovereign is a wholly-owned subsidiary of parent Daka, Inc. ("Daka"), a Massachusetts corporation which operated a successful food service company. Tr., 7. When Boulevard and Sovereign entered the lease, Daka simultaneously executed a guaranty of all of Sovereign's liabilities under the lease agreement in favor of both Boulevard and Union Trust. Most importantly, Daka guaranteed Sovereign's liability for the minimum rent payments representing the debt service on the UTC mortgage. Comp. ¶¶ 16–17.

In April 1986, Sovereign took possession of the property and began managing the hotel. From April 1986 until May 1989, Sovereign made all minimum rent payments as required under the lease agreement.[1] However, shortly after opening the hotel, the Connecticut real estate market deteriorated and the hotel became unprofitable. It quickly became apparent that the hotel could not generate enough revenue to cover even the minimum rent payments. Thus, from 1987 until it stopped paying rent in May 1989, Sovereign actually had to pay additional cash from its own reserves so it could fulfill its obligation to cover the debt service payments on the UTC mortgage.

In the fall of 1988, Daka merged with Fuddruckers, a corporation which operates a chain of well-known restaurants throughout the United States. Tr., 9. As a result of that merger, the entities created Daka International, Inc. ("Daka International"), a new holding company which became the parent corporation of Daka and Sovereign. Also in connection with the merger, several senior executives of Fuddruckers became the senior management of Daka International, among them William Baumhauer, who became President and Chief Operating Officer of Daka International. Tr., 9–10, 71–72.

It is undisputed that in May 1989, Daka International, as a substantial and controlling shareholder of Daka and Sovereign, approached plaintiff in an attempt to renegotiate the lease agreement. Comp. ¶ 36. After unsuccessful attempts to renegotiate the bank loan with Union Trust, Sovereign ceased making rent payments as required under the lease. After plaintiff gave Sovereign a notice of default, it conveyed its interest in the property to UTC by quitclaim deed in lieu of foreclosure. Def.'s Prop. F/F, ¶ 11. Following plaintiff's conveyance of the property and termination of the lease, defendants entered into a management agreement with Union Trust that allowed them to continue to manage the hotel for a management fee. Any profits derived from the operation of the hotel were used to reduce the outstanding mortgage on the property. Tr., 33–34.

In addition to transferring its property interest, plaintiff assigned to UTC its claim to any unpaid rents owed by defendants prior to the conveyance but separately reserved the right to pursue all causes of action that resulted from the breach of the lease agreement. Ex. 34. Following the assignment, UTC filed a complaint in this court seeking: 1) all unpaid rent due under the lease; and 2) an accounting of all revenues earned and expenses incurred by Sovereign during its period of management. *Second C & L Hold-*

---

1. According to the testimony of Peter Penczer, a general partner of Boulevard who was primarily responsible for negotiating the terms of the UTC mortgage, the "minimum rent" payment for the first two years of the lease consisted solely of interest on the underlying mortgage. Thus, Sovereign paid only interest for the first two years of the mortgage. After this period ended and the mortgage payments increased to reflect both interest and principal payments, defendants paid

UTC a fee of eighty thousand dollars ($80,000) to extend the "interest only" period. Tr., 77–78. In April 1989, the interest rate on the mortgage increased, causing Sovereign's monthly payment to increase by approximately twenty thousand dollars ($20,000) from $72,222 to $91,736 per month. Pl.'s Trial Memo., ¶ 14. Shortly after this increase, defendant Sovereign Hotels breached the lease agreement.

ings, Inc., et. al v. Sovereign Hotels, Inc., et al., 90 Civ. 009 (TFGD) (February 9, 1990) at 5–6. After reaching a settlement, the parties filed a stipulation of dismissal which was signed by Judge Daly of this court on June 1, 1992. Tr., 19; Def.'s Post–Trial Br., Ex. 1.

The essential dispute in this case revolves around the status of plaintiff's rights after the property conveyance to UTC. Plaintiff claims that when it conveyed its interest in the property to the bank, it expressly reserved the right to sue Sovereign and Daka for damages resulting from their willful breach of the lease. Thus, Boulevard did not assign its "right to sue defendants for consequential and incidental damages; the loss of its investment in the property, and the loss of its expectation interest." Tr., 18. Defendants, on the other hand, argue that by conveying the property by quitclaim deed, plaintiff relinquished any remaining claims it had under the lease. Defendants claim that the language contained in the quitclaim deed unequivocally transferred plaintiff's ownership interest in the property to the bank and "assign[ed] [UTC] all rights whatsoever in the property," including the right to recover monetary damages for breach of the lease agreement. Tr., 34–36.

## DISCUSSION

■ It is a basic tenant of property law that a lease is both a conveyance and a contract. See generally, 49 Am.Jur.2d § 176 at 200 (1993); I American Law of Property § 3.11 (1952); Clean Corp. v. Foston, 33 Conn.App. 197, 201, 634 A.2d 1200, 1202 (1993). A lease is "both the conveyance of a protected possessory interest to the tenant and a contract specifying numerous rights and duties of the parties...." 2 Richard R. Powell, Powell on Real Property, ¶ 221(2) at 16–11 (rev. ed. 1993). Accordingly, a lease agreement gives rise to two separate and distinct legal rights: property rights and contract rights. A lessor's property rights include: 1) the right to receive or sue a tenant for unpaid rents; and 2) a reversionary right in the leased property after the

lease is terminated. I American Law of Property § 3.59. More importantly, the lessor's contract rights include: 1) the right to sue for the breach of various express and implied covenants in the lease; and 2) the right to damages resulting from the breach of the lease contract. 2 Powell on Real Property ¶ 246[a][i] at 17–8.

■ Where a tenant breaches a lease by ceasing to pay rent, the landlord has two legal options: it may continue the tenancy and sue the tenant for the unpaid rent or it may terminate the lease agreement and sue for resulting damages as in any contract action. Rokalor, Inc. v. Connecticut Eating Enterprises, Inc., 18 Conn.App. 384, 388, 558 A.2d 265, 268 (1989). While Connecticut courts have not discussed at length the consequences to the mortgagor of conveying a property interest by deed in lieu of foreclosure, it has been noted that the deed, absent a contrary agreement, effectively extinguishes the borrower's right of redemption, including the borrower's attendant rights to possess the property and to collect any income from the property. I American Law of Property § 3.63.[2] As a result, defendants have correctly noted that plaintiff no longer retains any property rights in the above-mentioned property that would allow him to sue to recover rents.

■ However, the single faulty premise that leads to defendants' erroneous conclusion is summarized by their statement that "[t]he breach of lease by Sovereign for non-payment of rent, ... constituted a single cause of action which could not be split or apportioned." Def.'s Post–Trial Br., 8. This statement is clearly erroneous as a matter of law. The doctrine of res judicata, or claim preclusion, generally prevents the litigation of any claim or ground of recovery that was available to a party in a prior action regardless of whether the prior judgment actually determined that claim or ground. Prime Management Co., Inc. v. Steinegger, 904 F.2d 811, 815 (2d Cir.1990). However, the

2. See also, 2 Powell on Real Property ¶ 248[3] at 17–55 ("Transferees of the landlord's reversion have been held entitled to the benefit of ... [the] tenant's covenant to pay rent.... With regard to covenants that are already breached at the time of the transfer of the reversion, the transferee does not acquire a right to sue merely as a result of the transfer.")

fact that "both suits involved 'essentially the same course of wrongful conduct' is not decisive." *Id.* at 815–16 (*quoting Lawlor v. National Screen Service Corp.*, 349 U.S. 322, 327, 75 S.Ct. 865, 868, 99 L.Ed. 1122, 1127 (1955)).

■ While Sovereign's breach resulted from a single act, the nonpayment of rent under the lease agreement, it violated plaintiff's property rights and contract rights under the lease. Plaintiff is not seeking income "from the property" in the nature of unpaid rents. Instead, plaintiff is seeking damages to which it became entitled at the moment Sovereign breached the lease "contract." This is a crucial distinction because while a claim for rents could not survive the termination of a lease agreement, there is ample precedent that an action for damages does survive a lease termination. *See, Rokalor,* 558 A.2d at 268. Accordingly, the doctrine of res judicata does not bar plaintiff's claim as defendants erroneously contend.

■ Unlike the plaintiff in *Second C & L Holdings,* plaintiff is not seeking unpaid rent under the lease but damages which it incurred as a consequence of defendants' breach, namely, the loss of its investment in the property exceeding one million dollars as well as the loss in appreciation of the property. Pl.'s Trial Memo. at 7–8. Moreover, as with any contract, the construction of a lease is a question of law that must be construed as a whole, giving effect to every provision. *Haddad v. Francis,* 40 Conn.Sup. 567, 575, 537 A.2d 174, 178 (1986), *aff'd,* 13 Conn.App. 324, 536 A.2d 597 (1988). According to this court's interpretation of Article 9.0 of the Lease Agreement, the parties expressly contracted for such damages in the event of a breach when they agreed:

> 9.0 The Tenant shall indemnify and hold harmless the Landlord against all liabilities, damages and other expenses, including reasonable attorneys' fees, which may be imposed upon, incurred by, or asserted against the Landlord by reason of any of the following occurring during the terms of this Lease:

> . . . . .

> (b) Any failure on the part of the Tenant to perform or comply with any covenant required to be performed or complied with by the Tenant hereunder.

■ Although defendants attempt to reduce this case to simply "two businessmen who made two bad judgments," it is not the function of this court to relieve a party from a hard or oppressive bargain absent a finding of fraud or deceit, neither of which are present in this case. *Lopinto v. Haines,* 185 Conn. 527, 530–31, 441 A.2d 151, 154 (1981); *Murphy v. McNamara,* 36 Conn.Supp. 183, 190, 416 A.2d 170, 176 (1979). This court finds as a matter of law that while the conveyance of property by quit claim deed in lieu of foreclosure does extinguish the mortgagor's rights to future rents and possession of the mortgaged property, it does not terminate the former tenant's liability for the breach of any express or implied covenants in the lease which occurred prior to the conveyance. Accordingly, defendants Sovereign Hotels and Daka Inc. are jointly and severally liable for any damages incurred by Boulevard as a result of defendant Sovereign Hotels' breach of the lease agreement executed between the parties in April 1985.

*Tortious Interference Claim*

In Count 3 of its complaint, plaintiff, additionally, moves for judgment against Daka International for tortious interference with plaintiff's business relations with Sovereign and Daka. More specifically, plaintiff claims that "Daka International . . . wrongfully caused [and] induced Sovereign and Daka to breach the Lease, and to refuse to pay any and all further payments required to be made by those defendants thereunder." Comp. ¶ 38.

■ Connecticut courts have long recognized a cause of action for tortious interference with contract rights or other business relations. To recover on a claim of tortious interference, plaintiff must prove that a contractual or beneficial relationship existed between the parties and that defendant, with knowledge of that relationship, intentionally sought to interfere with it, causing plaintiff to suffer an actual loss. *Blake v. Levy,* 191 Conn. 257, 260, 464 A.2d 52, 54–55 (1983);

*Harry A. Finman & Son, Inc. v. Connecticut Truck & Trailer Service Co.*, 169 Conn. 407, 415, 363 A.2d 86, 93–94 (1975).

In order to find that a contractual relationship existed between the parties, this court need look no further than the lease agreement. *Rokalor*, 558 A.2d at 268; *see also Amwax Corp. v. Chadwick*, 28 Conn.App. 739, 741, 612 A.2d 127, 129 (1992) (a lease is a contract and questions concerning it are determined in accordance with usual contract law). Moreover, it is undisputed that Daka International, who was not a party to the lease, had full knowledge of the existing business relationship between Boulevard, Sovereign and Daka when it completed the merger with Daka in 1988. As a result, this court need only concern itself with the question of whether Daka International's interference with the contract existing between the parties caused plaintiff's economic losses.

 As defendants have pointed out, the standard for determining tortious interference is not whether the party "intend[ed] to injure, but [whether it] interfer[ed] without justification with plaintiff's contractual rights with knowledge thereof." *R & W Hat Shop v. Sculley*, 98 Conn. 1, 118 A. 55, 59 (1922). Regardless of whether a party's purpose for interfering is "legitimate and commendable," it cannot induce another to act in a manner that would violate plaintiff's rights. *Id.*

 Considering the testimony adduced at trial, this court finds that defendant Daka International interfered with the Boulevard–Sovereign lease agreement solely to protect the financial health of Daka International's consolidated corporate group. As William Baumhauer, Chairman and Chief Executive Officer of Daka International, Inc., testified:

Q. Upon assuming your duties as President and Chief Operating Officer of Daka International, one of the things that you started to do was to review the performance of the operating subsidiaries, right?

A. Yes.

Q. And that review included, in particular, a review of the performance of the operating subsidiaries that were managing hotels, right?

A. Yes.

. . . . .

Q. In connection with your review of the hotel management operations, you became concerned; did you not, sir, about the financial health of the various different hotel properties that Sovereign was managing?

A. Yes.

Q. You expressed that concern in the internal deliberations that took place in a committee that was called the "Executive Committee of Daka International," didn't you?

A. Yes.

. . . . .

Q. And in connection with the deliberations that you have referred to, that took place in the Executive Committee discussions, you made recommendations for Sovereign to get out of the management of several of the hotel properties it was running, didn't you?

A. Yes.

. . . . .

Q. You did; did you not, sir, make a recommendation within the Daka International Executive Committee, that rental payments by Sovereign on Boulevard's hotel in Stratford be stopped?

A. I don't recall that in an Executive Committee meeting.

Q. You don't deny you made that recommendation right?

A. I said I do not recall that in an Executive Committee meeting.

Q. I understand. Now let's put the Executive Committee meeting aside.

You don't deny you made that recommendation, do you?

A. Made what recommendation?

Q. The recommendation, sir, that Sovereign stop paying rent on the Boulevard property.

A. I made a recommendation, or I referred to the fact that we did not have money to pay rent. I think that's a little different, the connotation, than what you're trying to imply.

Q. You discussed the subject matter with Terry Vince [President of Daka, Inc.], didn't you?

A. Yes I did.

Q. And to Mr. Terry Vince, you made an express personal recommendation, in words or substance, to the effect, "Let's stop paying rent on this hotel in Stratford."

Isn't that true sir?

A. I told Mr. Vince we must cut the losses at the Stratford.

Tr. 72–79.

Plaintiff has also presented evidence that Daka International requested a meeting with Boulevard's partners in May 1989, at which time Mr. Baumhauer informed plaintiff that Sovereign would stop paying the rent required by the lease unless plaintiff agreed to a substantial reduction in the lease payments. Pl.'s Trial Memo., ¶¶ 15–16; Tr., 93–96. Following this request, Mr. Baumhauer mailed a letter to plaintiff on Daka International's stationary demanding "an immediate reduction in the minimum rents." Ex. 19. Shortly after these communications, Sovereign breached its lease with Boulevard by ceasing its rent payments. Plaintiff has introduced more than enough evidence to find that Daka International intentionally intimidated Boulevard and interfered in its lease with Sovereign. Accordingly, this court agrees with plaintiff that Daka International, by providing the catalyst for Sovereign's breach of the lease agreement, tortiously interfered in Boulevard's business relations and is jointly and severally liable with Sovereign and Daka for all damages proven by plaintiff during the damages phase of this trial.

*Plaintiff's CUPTA Claim*

Plaintiff additionally alleges that Sovereign's breach of the lease agreement as well as Daka International's tortious interference with its business relations constitute a violation of the Connecticut Unfair Trade Practices Act ("CUPTA"). More specifically, plaintiff claims that "all defendants, by their cavalier disregard of [plaintiff's] rights under the lease, their willful breach and repudiation, and their malicious interference with [plain-tiff's] business relations, are jointly and severally liable" for violating CUPTA. Pl.'s Trial Memo.Supp.Judge. Against All Def.'s, 23.

Section 42–110b(a) of the Connecticut General Statutes provides: "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Section 42–110a(4) includes in the definition of "trade of commerce" a "lease ... or the offering for ... lease ..., or the distribution of any property ... in this state." Accordingly, disputes concerning lease agreements are within the parameters of CUPTA.

■ In determining whether the practice in question violates CUPTA, Connecticut courts have considered: 1) whether the practice offends public policy as it has been established by statutes, the common law or other established concepts of unfairness, or 2) whether it is immoral, unethical, oppressive or unscrupulous. *Sanghavi v. Paul Revere Life Ins. Co.*, 214 Conn. 303, 311–12, 572 A.2d 307, 311 (1990); *Sportsmen's Boating Corporation v. Hensley*, 192 Conn. 747, 753, 474 A.2d 780, 786 (1984). It is not necessary to satisfy both criteria in order to find a CUPTA violation; a practice may be unfair because of the decree to which it meets one criteria or because to a lesser extent it meets both criteria. *Atlantic Richfield Co. v. Canaan Oil Co.*, 202 Conn. 234, 242, 520 A.2d 1008, 1013 (1987).

■ Defendants argue that plaintiff cannot bring a claim under CUPTA because its allegations "arise out of the same group of facts as gave rise to the allegedly unlawful injury which allegedly entitled Union Trust to relief in its breach of contract action." Def.'s Post–Trial Br., 23. Thus, plaintiff's CUPTA claims "were part of the same cause of action that [ ] plaintiff ... assigned to and permitted [UTC] to litigate." *Id.* To support their argument, defendants relied on *Duhaime v. American Reserve Life Ins. Co.*, 200 Conn. 360, 511 A.2d 333 (1986), wherein the court dismissed a CUPTA claim against an insurance company brought by a plaintiff who had previously been awarded benefits under a disability policy. The court found that the judgment plaintiff received on his

disability claim barred any additional recovery under CUPTA because he was seeking to relitigate a single claim under a new theory in order to obtain an additional remedy. 511 A.2d at 335–36.

Again, this court finds defendants' argument totally without merit. As we previously found, UTC did not bring a cause of action for breach of the lease "contract;" UTC specifically limited its claim to the unpaid rents under the lease—a claim that directly flowed from the property rights conveyed by plaintiff through the quitclaim deed. On the other hand, plaintiff has brought a claim to recover damages resulting from defendant's breach of the lease. Unlike the plaintiff in *Duhaime*, plaintiff is not "seeking to relitigate a single claim under a new theory." 511 A.2d at 336. To the contrary, Boulevard is seeking recovery on a contract claim, a claim that is separate and distinct from UTC's property claim.

 This court finds that plaintiff has introduced sufficient evidence at trial to find a CUPTA violation. It is undisputed that defendants, notwithstanding the losses they allegedly incurred under the lease, willfully breached the lease when Sovereign stopped paying the minimum rent in May 1989. Moreover, we are persuaded by the evidence presented that Sovereign's decision to breach the lease was caused by Daka International's desire to protect the financial health of its corporate group. In light of this evidence, this court finds that defendants' actions have offended traditional common law concepts of fairness and have caused substantial injury to plaintiff. Thus, defendants are jointly and severally liable to plaintiff for an amount of damages which shall be determined by this court during the damages phase of this trial. Recovery on more than one theory for the same injury would, of course, be barred. *Kozman v. Trans World Airlines*, 236 F.2d 527, 536 (2d Cir.1956).