72 F.3d 1029
 BOULEVARD ASSOCIATES, A General Partnership,
Plaintiff-Appellee-Cross-Appellant,
v.
SOVEREIGN HOTELS, INC., Daka, Inc. and Daka International,
Inc., Defendants-Appellants-Cross-Appellees.
 Nos. 42, 257, Docket 94-9020, 94-9090.
 United States Court of Appeals,
Second Circuit.
 Argued Aug. 30, 1995.
Decided Dec. 15, 1995.
 
 John E. Coyne, Menard, Murphy & Walsh, Boston, Mass. (Clifford Thau, Squadron, Ellenoff, Pleasent, Sheinfeld & Sorkin, New York City, on the brief), for defendants-appellants-cross-appellees.
 Frederick S. Gold, Cohen & Wolf, P.C., Stamford, Conn. (Daniel F. Wolf, Cohen & Wolf, P.C., on the brief), for plaintiff-appellee-cross-appellant.
 Before: CARDAMONE, MINER, and CALABRESI, Circuit Judges.
 CALABRESI, Circuit Judge:
 
 
 1
 The legal relationship between landlords and tenants is a strange hybrid of contract and property law. When a tenant fails to pay rent, Connecticut law, recognizing the hybrid, allows the landlord to choose either a contract remedy or a property remedy--but does not permit both. The landlord can terminate the lease and sue for damages based on the contract relationship. Or, the landlord can opt to maintain the lease and, based on the property relationship, demand back rent.
 
 
 2
 In this case, defendant Sovereign Hotels, Inc. ("Sovereign") stopped paying rent to its landlord, plaintiff Boulevard Associates ("Boulevard"). Instead of terminating the lease, Boulevard conveyed the lease to a third party and purported to reserve its contract remedy against Sovereign--at least for consequential damages arising from the tenant's failure to pay rent. The district court held that the landlord had indeed reserved its right to seek such damages because the lease included an indemnification clause, which allowed it to sue Sovereign regardless of whether the landlord had terminated the lease. Boulevard Assocs. v. Sovereign Hotels, Inc., 852 F.Supp. 127, 132 (D.Conn.1994) (finding liability); 861 F.Supp. 1132, 1136-40 (D.Conn.1994) (awarding damages); 868 F.Supp. 70, 71-74 (S.D.N.Y.1994) (awarding attorneys' fees). Because permitting Boulevard to bring this suit does not comport with Connecticut's carefully crafted balance between property and contract remedies, we reverse.
 
 I. BACKGROUND
 
 3
 In 1985, Boulevard leased a parcel of property in Stratford, Connecticut, to Sovereign for ten years. As part of the lease, Boulevard agreed to build a hotel that would be managed by Sovereign. Boulevard subsequently obtained an $8 million mortgage from the Union Trust Company ("Union Trust") and built the hotel. Sovereign, in turn, agreed to pay rent covering, among other things, debt service on the Union Trust mortgage. Daka, Inc. ("Daka"), Sovereign's parent company, guaranteed all of Sovereign's liabilities under the lease, including the obligation to pay rent.
 
 
 4
 Unfortunately, the hotel turned out to be a failure. Because the venture never generated enough revenue to cover its expenses, Sovereign had to draw on its own reserves to pay the rent through May 1989. At that point, when the agreement called for the monthly rent to increase by approximately $20,000 to cover principal due under the Union Trust mortgage, representatives from Daka International, Inc. ("Daka International"), the parent company of Daka, approached Boulevard in an attempt to renegotiate the lease. (According to testimony by William Baumhauer, the Chairman and CEO of Daka International, he was trying to extricate Sovereign from a number of ventures out of concern for its financial condition.) At a meeting with Boulevard representatives in May 1989, Baumhauer stated that Sovereign would stop paying rent unless Boulevard agreed to reduce Sovereign's payments under the lease. Baumhauer subsequently memorialized his position in a letter to Boulevard. When Boulevard was unable to refinance the mortgage with Union Trust, these efforts to renegotiate the lease fell through and Sovereign stopped paying rent.
 
 
 5
 In August 1989, Union Trust informed Boulevard that unless the property was deeded over to the bank, Union Trust would start foreclosure proceedings. On September 5, 1989, Boulevard conveyed the hotel, land, and lease to Union Trust's designee. Although the deed provided that it was "an absolute conveyance of all of [Boulevard's] right, title, and interest in and to the Property, including but not limited to any lease or leases in respect of the Property," Boulevard stated in an accompanying letter that it reserved all rights and causes of action against Sovereign that had already arisen. In return for these conveyances, Union Trust released Boulevard from its obligation to repay the $8 million mortgage. But, consonant with Boulevard's letter, the release also stated that Boulevard's existing rights against Sovereign were to be unaffected by the release.
 
 
 6
 Union Trust's designee subsequently terminated the lease and entered into a new lease with Sovereign. The designee later sued Sovereign in contract for damages measured by the unpaid pre-assignment rent.[1] This suit was eventually settled by the parties out of court.
 
 
 7
 In July 1990, Boulevard brought this action against Sovereign, Daka, and Daka International in the United States District Court for the District of Connecticut (Constance Baker Motley, Senior District Judge, sitting by designation ). The district court held a bench trial in two phases, the first dealing with liability, the second with damages. In the first phase the court found that Sovereign had breached the lease and was liable for contract damages, 852 F.Supp. at 131-32; that Daka was jointly and severally liable for those damages as the guarantor of Sovereign's obligations under the lease, id. at 132; that Daka International had tortiously interfered with the lease by directing Sovereign to stop paying rent, id. at 132-34; and that all of the defendants had violated the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn.Gen.Stat. Secs. 42-110a to 42-110q, by willfully breaching the lease, 852 F.Supp. at 134-35.
 
 
 8
 In the damages phase of the trial, the court found that there was insufficient evidence about the current value of the hotel to calculate expectation damages under Connecticut law. 861 F.Supp. at 1138. It did, however, award reliance damages of $1,134,497, plus interest, jointly and severally against the defendants, based on the amount of money Boulevard had invested in the hotel minus the $8 million in debt relief it received by conveying the property to Union Trust's designee. Id. at 1138-39 (reliance damages), 1140-41 (interest). Finally, the court awarded $300,000 in punitive damages, plus attorneys' fees, against Daka International for tortiously interfering with the lease and for violating CUTPA. Id. at 1139-40; 868 F.Supp. at 71-74 (fixing amount of attorneys' fees jointly and severally against all defendants).
 
 
 9
 The defendants raise four issues on appeal. First, they argue that Boulevard is not entitled to maintain a breach of contract claim because it did not terminate the lease, but instead conveyed it to a third party. In this regard, they also contend that the indemnification clause in the lease was only meant to protect Boulevard from claims asserted by third parties, and not from consequential damages arising from Sovereign's failure to pay rent. Second, they argue that Daka International did not tortiously interfere with the lease because, as Sovereign's parent company, it was entitled to direct its subsidiary to stop paying rent. And in any event, they claim that Daka International did not engage in intimidating or otherwise improper behavior. Third, they maintain that Boulevard has failed to allege that the defendants engaged in aggravating conduct, beyond breaching the lease, that would constitute an unfair action in violation of CUTPA. And finally, they challenge the court's award of reliance damages.
 
 
 10
 Boulevard cross-appeals, arguing that the district court erred in awarding reliance damages rather than expectation damages.
 
 II. DISCUSSION
 A. Breach of the Lease
 
 11
 Sovereign argues that Boulevard is not permitted to bring a breach of contract action because, instead of terminating the lease, it conveyed the lease to a third party. The district court rejected this argument on two grounds. The court noted that when Boulevard conveyed the lease to Union Trust's designee, it expressly reserved its contractual right to sue Sovereign for "any and all consequential and incidental damages" arising from breach of the lease. 861 F.Supp. at 1136. The court, moreover, held that Boulevard had in fact "manifest[ed] an intention to terminate the lease" by filing the present lawsuit; and that this sufficed to permit an action to be brought for damages. Id. (citing Danpar Assocs. v. Somersville Mills Sales Room, Inc., 182 Conn. 444, 445-46, 438 A.2d 708, 709-10 (1980) (where "the plaintiff [chooses] to bring an action for damages for breach of the lease, [such action] manifest[s] an intention to terminate the lease")).
 
 
 12
 We disagree with both of the district court's conclusions. Connecticut has expressly chosen to give a landlord two mutually exclusive remedies when a tenant fails to pay rent: the landlord can either terminate the lease and sue for contractual damages, or continue the lease and sue for back rent. Rokalor, Inc. v. Connecticut Eating Enters., 18 Conn.App. 384, 388-89, 558 A.2d 265, 268 (1989). The district court correctly observed that under Connecticut law, a landlord can manifest an intention to terminate the lease by filing a lawsuit seeking damages for the tenant's breach of the lease. 861 F.Supp. at 1136. But Boulevard was no longer the landlord when it filed the present lawsuit in July 1990; it had conveyed the lease to Union Trust's designee more than ten months earlier. Accordingly, Boulevard no longer had any right to terminate the lease--and never having terminated the lease, it cannot now maintain an action for contractual damages against its former tenant.
 
 
 13
 Boulevard contends, however, that when it conveyed the lease to Union Trust's designee it expressly reserved its right to sue Sovereign for breach of contract. That may be. It may also be that any contract damages that might have accrued to Union Trust's designee on account of Sovereign's failure to pay pre-assignment rent could ultimately be owing to Boulevard. Thus, when the designee terminated the lease, any pre-assignment damages that became available to the designee under Connecticut law might properly be Boulevard's. In that event, Boulevard could sue the assignee for such damages. Though we obviously take no position on what might be the result of such a hypothetical action, which is not before us, it is enough for us to note that any such agreement between Boulevard and its assignee could not increase Sovereign's liability under Connecticut law. Specifically, it cannot give rise to this action by Boulevard against Sovereign for damages, based on a lease that Boulevard did not terminate. To hold otherwise would be to permit Boulevard and its assignee, by writing such a clause into a contract between them, to preserve Sovereign's liability for back rent under the lease,[2] while making Sovereign liable to Boulevard for damages arising from those same unpaid rents. It is precisely this double exposure that Connecticut law does not allow.
 
 
 14
 The district court nevertheless held that Boulevard had retained an independent right to sue Sovereign for breach of contract, despite having transferred away its interest in the lease. The court focused on the lease's indemnification clause, Article 9, which reads as follows:
 
 
 15
 The Tenant shall indemnify and hold harmless the Landlord against all liabilities, damages and other expenses, including reasonable attorneys' fees, which may be imposed upon, incurred by, or asserted against the Landlord by reason of any of the following occurring during the term of this Lease:
 
 
 16
 ....
 
 
 17
 (b) Any failure on the part of the Tenant to perform or comply with any covenant required to be performed or complied with by the Tenant hereunder.
 
 
 18
 According to Boulevard and the district court, Sovereign's failure to pay the rent forced Boulevard to convey away its interest in the Stratford property, and thereby to lose its initial investment of over $1 million in the property. This loss, Boulevard contends, was an expense that it incurred as a result of Sovereign's failure to comply with a covenant of the lease. The loss thus gave rise to a contract action against Sovereign under the indemnification clause, an action that according to Boulevard was separate and independent of any contract action that would arise on termination of the lease. It was, moreover, an action that had accrued before the assignment and was therefore retained by Boulevard.
 
 
 19
 Article 9 cannot, however, bear the weight plaintiff places on it. Even if we were to accept Boulevard's argument that this otherwise unremarkable indemnification clause was actually intended to create a right to consequential damages stemming from a tenant's failure to pay rent, Boulevard's claim would fail. Such a claim would still be based on Sovereign's failure to pay rent, and, as we have already noted, Connecticut law permits damages claims resulting from nonpayment of rent only after the lease has been terminated. In the present case, Boulevard never terminated the lease, so no cause of action--whether labelled a claim for consequential damages or for indemnification--had accrued against Sovereign when Boulevard transferred the lease to Union Trust's designee. Since no claim against Sovereign "had already arisen" at the time it transferred the lease, Boulevard did not, by the terms of the transfer, reserve the claim.
 
 
 20
 Boulevard further argues, however, and the district court agreed, that the indemnification clause imposed on Sovereign a separate and independently enforceable covenant to pay rent. There doubtless exist lease covenants that may be enforced without terminating the lease. Usually, these covenants include a tenant's duty to perform, or refrain from performing, some action on the leased premises. See RESTATEMENT OF PROPERTY (SECOND), LANDLORD & TENANT Sec. 13.1 (1976) ("Except to the extent the parties to a lease validly agree otherwise, if the tenant fails to perform a valid promise contained in the lease to do, or to refrain from doing, something on the leased property or elsewhere ... the landlord may: (1) terminate the lease and recover damages; or (2) continue the lease and obtain appropriate equitable and legal relief, including ... recovery of damages...."). But these default rules, allowing landlords to seek damages without terminating a lease unless the parties agree to the contrary, may well be different from the default rules governing breaches of covenants to pay rent. See RESTATEMENT OF PROPERTY (SECOND), LANDLORD & TENANT Sec. 12.1 (stating that, if the tenant fails to pay rent, the landlord may either recover the unpaid rent or terminate the lease, absent agreement to the contrary). And they certainly do not apply to damages for unpaid rent under Connecticut law. See Rokalor, 18 Conn.App. at 388-89, 558 A.2d 265.
 
 
 21
 Since these are no more than default rules, the parties will in general be free to contract around them--by agreeing, for example, that the landlord can sue the tenant for damages, upon nonpayment of rent, without first terminating the lease. But the parties must clearly indicate their intention to deviate from the default rule. And we will not lightly infer that the parties intended such a deviation if they did no more than adopt a run-of-the-mill indemnification clause. We have previously noted that "[i]ndemnity agreements are generally designed only to protect against liability for damage to third parties." Atlantic Richfield Co. v. Interstate Oil Transp. Co., 784 F.2d 106, 115 (2d Cir.), cert. denied, 479 U.S. 817, 107 S.Ct. 75, 93 L.Ed.2d 31 (1986). The clause in the case before us fails to demonstrate an intent to give Boulevard a claim for consequential damages against Sovereign, and fails also to permit Boulevard to convert claims based on nonpayment of rent--which it would possess by virtue of the common law only after terminating the lease--into claims that it could assert during the pendency of the lease.
 
 
 22
 In sum, we hold that Boulevard's failure to terminate the lease left them without a common law right to damages, and that the indemnification clause cannot serve as a substitute for that common law right. Accordingly, the district court erred in awarding damages for Sovereign's breach of the contract.
 
 B. Tortious Interference with Contract
 
 23
 The district court also found that Daka International "interfered with the Boulevard-Sovereign lease agreement solely to protect the financial health of Daka International's consolidated corporate group," 852 F.Supp. at 133, and that the CEO of Daka International "intentionally intimidated" Boulevard by threatening to breach the lease unless Boulevard agreed to lower Sovereign's rent, id. at 134. The court therefore found Daka International jointly and severally liable with Sovereign and Daka for the general contract damages, and solely liable for an additional $300,000 in punitive damages.
 
 
 24
 We do not doubt that the management of Daka International directed Sovereign to stop paying rent, and thereby to breach its lease with Boulevard. Daka International, however, gives two reasons why its action was not tortious. First, it contends that a parent corporation is privileged to protect its subsidiary's economic interests by directing it to breach an unprofitable contract. Second, it argues that there is no evidence that it employed improper methods to induce Sovereign to breach the lease. Specifically, Daka International denies that there is any evidence whatever that it engaged in intimidating conduct toward any party, and points out additionally that the only intimidation even alleged was towards Boulevard, not towards Sovereign, the party that it supposedly induced to breach the lease.
 
 
 25
 As the district court noted, a party tortiously interferes with another's contractual rights whenever, "without justification," it knowingly interferes in the plaintiff's contractual rights. 852 F.Supp. at 133. Although the district court correctly observed that an otherwise " 'legitimate and commendable' " purpose does not excuse the use of wrongful means to interfere with another's contractual rights, id. (quoting R & W Hat Shop v. Sculley, 98 Conn. 1, 118 A. 55, 59 (1922)), it erred in failing to consider whether Daka International's actions were wrongful in the first place.
 
 
 26
 The Connecticut Supreme Court has not squarely addressed the issue we face today. But the lower courts are in agreement that generally "there can be no tortious interference of contract by someone who is directly or indirectly a party to the contract." Baum v. United Cable Television Corp. of E. Conn., 1992 WL 175119, at * 4 (Conn.Super.Ct. July 20, 1992) (citing Multi-Service Contractors, Inc. v. Town of Vernon, 193 Conn. 446, 451-52, 477 A.2d 653, 655-56 (1984) (dismissing claim of tortious interference against town officials by a company that contracted with the town because, as the town's agents, they could not be held liable absent allegations of willful misconduct or lack of good faith)); see, e.g., Walsky v. Gastaldi, 1990 WL 269143, at * 2 (Conn.Super.Ct. July 26, 1990). As one court has explained:
 
 
 27
 An agent acting legitimately within the scope of his authority cannot be held liable for interfering with or inducing his principal to breach a contract between his principal and a third party, because to hold him liable would be, in effect, to hold the corporation liable in tort for breaching its own contract. An agent, however, can be held liable for such interference or inducement if he did not act legitimately within his scope of duty but used the corporate power improperly for personal gain.
 
 
 28
 Murray v. Bridgeport Hosp., 40 Conn.Supp. 56, 60-61, 480 A.2d 610, 613 (1984) (citation omitted); see also Espinosa v. Connecticut College, 1994 WL 320222, at * 5-* 6 (Conn.Super.Ct. June 27, 1994) ("In order to deprive a corporate employee of his immunity, the plaintiff must establish that he acted solely for his own benefit and benefit to the corporation played no role therein."); Smith v. Brown, 1992 WL 219300, at * 2 (Conn.Super.Ct. Aug. 28, 1992) (requiring an allegation, to state a claim for tortious interference, that "plaintiff engaged in some fraud, misrepresentation, intimidation or molestation, 'beyond the fact of the interference itself' "); cf. Multi-Service Contractors, 193 Conn. at 451, 477 A.2d 653.
 
 
 29
 In the only Connecticut case which, to our knowledge, involved a claim of tortious interference brought against a shareholder for inducing a breach of contract by a corporation, the Superior Court applied the same rule. Baum, 1992 WL 175119, at * 4 (holding that a majority shareholder was "at least an indirect party to the contract and therefore no cause of action can be sustained against it for tortious interference of contract"). Because there is a significant unity of interest between a corporation and its sole shareholder--indeed, an even greater unity than that which exists between a corporation and its agents or officers--we do not believe that such a shareholder can be considered a third party capable of "interfering" with its own company's contracts. Certainly, this unity of interest is not called into question when the shareholder's actions are taken to safeguard the interests of its company.
 
 
 30
 Courts in other states have uniformly found that a parent company does not engage in tortious conduct when it directs its wholly-owned subsidiary to breach a contract that is no longer in the subsidiary's economic interest to perform.[3] And a similar rule insulating the actions of corporate officers is equally well established.[4] We believe that the same rules apply in Connecticut.
 
 
 31
 We take care to explain what we do not hold today. We do not hold that a sole shareholder is privileged to employ any means, no matter how improper, to induce a breach of a contract involving its own company. Most states affording a privilege to sole shareholders have recognized that certain behavior may be sufficiently egregious to cross the line and become tortious. For example, one might imagine a sole shareholder who orders the president of his or her company, at gunpoint, to breach a contract with a third party. Or one might imagine a sole shareholder who, using fraudulent misrepresentations, deceives a third party into breaching its contract with the shareholder's own company. Cf. WKG-TV Video Elec. College, Inc. v. Reynolds, 618 So.2d 1023, 1027 (La.Ct.App.1993) (finding a corporate officer liable for inducing his corporation to breach its contract with a third party, where the officer sought to fraudulently retain a deposit from the third party). Accordingly, only a limited and qualified privilege to sole shareholders comports with the general rule under Connecticut law that actions involving "fraud, misrepresentation, intimidation or molestation" or "malic[e]" may give rise to a claim of tortious interference with contract, Kecko Piping Co. v. Town of Monroe, 172 Conn. 197, 201, 374 A.2d 179, 182 (1977) (citations omitted), and that to make out such a claim the plaintiff must prove "some improper motive or improper means," Blake v. Levy, 191 Conn. 257, 262, 464 A.2d 52, 55 (1983).
 
 
 32
 We need not demarcate with precision what sort of behavior on the part of a sole shareholder would be unacceptable, because we disagree with the district court's finding that Daka International, by informing Boulevard that Sovereign would cease rent payments if the amount due was not immediately reduced, engaged in the kind of conduct that could possibly have constituted tortious interference with the contract. As we noted earlier, the court found Daka International to have intentionally tried to intimidate Boulevard--not Sovereign, which ultimately breached the lease. 852 F.Supp. at 134. Tortious interference with contract requires the use of improper means to induce a party to breach the agreement; thus, Daka International's actions had to intimidate Sovereign rather than Boulevard. And there is no evidence whatever that Daka International intimidated Sovereign into breaching the agreement. Daka International simply directed its subsidiary, as it could do through the appropriate channels of corporate command, to stop paying the rent.
 
 
 33
 In fact, the record does not support the district court's findings that Daka International, by seeking to renegotiate the lease, "intentionally intimidated" Boulevard or anyone else. Daka International did not threaten to take any illicit action; it merely informed Boulevard that it would default on its rent payments if the parties did not amend the deal. This is neither improper nor unseemly. Under the circumstances, it was clear error to find that Daka International's actions rose to the level of "intimidating" conduct.
 
 
 34
 Nor is any of this altered by the district court's finding that Daka International was motivated by a desire to protect the financial interests of its "consolidated corporate group." It is unclear whether the district court meant that Daka International was not motivated by a desire to protect Sovereign's economic position as well as that of the parent group. But three observations are useful in this regard. First, the unrebutted testimony of William Baumhauer, Daka International's CEO, was that he ordered Sovereign to breach the contract to limit Sovereign's losses. Second, the plaintiff itself concedes that Sovereign was losing money under the lease. Third, there is no evidence that the economic interests of Sovereign and those of the Daka International "consolidated corporate group" diverged with regard to the lease.
 
 
 35
 There can be no doubt that it was in the economic interest of Sovereign to breach the lease. And so we have no occasion to consider whether a sole shareholder, motivated purely by self-interest, where that self-interest is contrary to the interests of its subsidiary, could in some circumstances be held liable for tortious interference when it directs its subsidiary to breach a contract. Nor need we decide whether or under what conditions a sole shareholder's use of improper methods would make tortious its interference in the contracts of a subsidiary. We conclude that Daka International committed no tort when it directed its wholly-owned subsidiary, Sovereign, to stop paying rent under its unprofitable lease with Boulevard.
 
 C. CUTPA Violations
 
 36
 The defendants finally challenge the district court's finding that they violated the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn.Gen.Stat. Secs. 42-110a to 42-110q. The central prohibition of CUTPA is contained in Sec. 42-110b(a), which provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." In determining whether a given action is "unfair," the Connecticut Supreme Court has adopted the so-called "cigarette rule" developed by the Federal Trade Commission in the context of section 5(a)(1) of the Federal Trade Commission Act. According to the cigarette rule, a court must consider:
 
 
 37
 (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise--whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [ (competitors or other businessmen) ].
 
 
 38
 Atlantic Richfield Co. v. Canaan Oil Co., 202 Conn. 234, 239, 520 A.2d 1008, 1012 (1987) (alterations in original); see also FTC v. Sperry & Hutchinson Co., 405 U.S. 233, 244 n. 5, 92 S.Ct. 898, 905 n. 5, 31 L.Ed.2d 170 (1972) (quoting Statement of Basis and Purpose of Trade Regulation Rule 408, Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed.Reg. 8355 (1964)).
 
 
 39
 The district court found that Sovereign's breach (and Daka International's role in ordering the breach) offended public policy because it was willful and done exclusively to protect the breaching party's financial security. The defendants maintain, instead, that a simple breach of contract does not offend traditional notions of fairness, and that their actions therefore did not violate CUTPA. We agree with the defendants and the vast majority of courts in Connecticut that asimple contract breach is not sufficient to establish a violation of CUTPA, particularly where the count alleging CUTPA simply incorporates by reference the breach of contract claim and does not set forth how or in what respect the defendant's activities are either immoral, unethical, unscrupulous or offensive to public policy.
 
 
 40
 Chaspek Mfg. Corp. v. Tandet, 1995 WL 447948, at * 12 (Conn.Super.Ct. June 16, 1995) (quoting Aussenhandel v. Grant AirMass Corp., 2 Conn.L.Rptr. 590, 1990 WL 283750 (Conn.Super.Ct.1990) (Lewis, J.)); see Emlee Equip. Leasing Corp. v. Waterbury Transmission, Inc., 41 Conn.Supp. 575, 580, 595 A.2d 951, 954 (1991) (" 'A simple breach of contract, even if intentional, does not amount to a violation of the Act; a [claimant] must show substantial aggravating circumstances attending the breach to recover under the Act....' ") (alteration in original) (quoting Bartolomeo v. S.B. Thomas, Inc., 889 F.2d 530, 535 (4th Cir.1989) (discussing similar North Carolina unfair trade practices act)); see also, e.g., Troxler Elec. Labs. v. Palilla, 1995 WL 299599, at * 3 (Conn.Super.Ct. May 10, 1995); A. Secondino & Son, Inc. v. L.D. Land Co., 1994 WL 728775, at * 2-* 3 (Conn.Super.Ct. Dec. 29, 1994) (recognizing this rule as the majority position in Connecticut); Set to Fit Realty v. First Stamford Corp., 1994 WL 161346, at * 6 (Conn.Super.Ct. Apr. 19, 1994); cf. NLRB v. M & M Oldsmobile, Inc., 377 F.2d 712, 715 (2d Cir.1967) (stating that, in context of National Labor Relations Act, breach of contract is "not ipso facto an unfair labor practice").
 
 
 41
 A rule to the contrary--that a company violates CUTPA whenever it breaks an unprofitable deal--would convert every contract dispute into a CUTPA violation. We cannot assume that the Connecticut legislature, in enacting CUTPA, intended such an extraordinary alteration of the common law.[5]
 
 
 42
 Because a breach of contract standing alone does not offend public policy, to invoke CUTPA, Boulevard was required to show that the defendants engaged in some conduct that was more offensive than simply not paying the rent. We have already rejected the notion that Daka International "intimidated" Boulevard by threatening to breach if the parties did not renegotiate the lease. Furthermore, Daka International's motive for directing Sovereign to stop paying rent--to back out of a business venture that was losing money--is precisely the standard reason for a breach and offends no particular public policy. Boulevard has therefore failed to allege, much less prove, any aggravating circumstances surrounding the breach of the lease, and so we hold that none of the defendants committed an "unfair" or "deceptive" act in violation of CUTPA.
 
 III. CONCLUSION
 
 43
 Under Connecticut law, a landlord may pursue one of two mutually exclusive remedies against a tenant who has defaulted on the rent: (1) terminate the lease and sue for contractual damages; or (2) continue the lease and sue for back rent. Because Boulevard did not terminate the lease before conveying away its interest, it cannot now sue its former tenant for damages. Nor does the general indemnification clause in the lease provide an independent basis for Boulevard to sue Sovereign for damages resulting from the tenant's nonpayment of rent.
 
 
 44
 Generally, a parent corporation does not, under Connecticut law, "tortiously" interfere with a contract when it directs its wholly owned subsidiary to breach a contract that threatens a present economic interest of the subsidiary. Even if this general rule were not to apply when the parent employed wrongful means, the record in this case does not support the district court's finding that Daka International used intimidating methods to induce a breach of the contract. We therefore conclude that Daka International did not tortiously interfere with the lease.
 
 
 45
 A simple breach of contract cannot constitute a violation of the Connecticut Unfair Trade Practices Act, Conn.Gen.Stat. Secs. 42-110a to 42-110q. There must be significant aggravating circumstances. Because Boulevard has failed to prove aggravating circumstances, it has not established that any of the defendants violated CUTPA.
 
 
 46
 Since we conclude that none of the defendants should have been held liable, we need not decide whether the district court used the correct measure of damages.
 
 
 47
 For all of the above reasons, we reverse the judgment of the district court.
 
 
 
 [1]
 It is not entirely clear from the record whether Union Trust's designee in fact terminated the lease and accordingly sought contract damages, or whether instead it sued Sovereign for unpaid rent under the lease. Although we assume for the purposes of this appeal that Union Trust terminated the lease--because this assumption is the one most favorable to Boulevard--it is not critical to our ruling. If Union Trust's designee never terminated the lease, then, under Connecticut law, no damages claims could be made either by the designee or by Boulevard
 
 
 [2]
 It appears from the record that after conveying the lease, Boulevard initially sought to recover the pre-assignment rent from Sovereign. Boulevard later disclaimed those rents in favor of its assignee
 
 
 [3]
 E.g., Phil Crowley Steel Corp. v. Sharon Steel Corp., 782 F.2d 781, 783-85 (8th Cir.1986) (holding that, under Missouri law, a parent corporation may interfere with its subsidiary's contractual relations when the contract threatens a present, existing economic or reputational interest of the subsidiary, but may not interfere solely to protect the parent's economic interest); Bendix Corp. v. Adams, 610 P.2d 24, 29 (Alaska 1980) ("[T]here is general agreement that a corporate shareholder ... would have a sufficient economic interest in a subsidiary corporation to interfere in some of the subsidiary's business relationships."); T.P. Leasing Corp. v. Baker Leasing Corp., 293 Ark. 166, 171, 732 S.W.2d 480, 483 (1987) ("[A] parent corporation's privilege permits it to interfere with another's contractual relations when the contract threatens a present economic interest of its wholly owned subsidiary, absent clear evidence that the parent employed wrongful means or acted with an improper purpose."); S.F.P. Realty Corp. v. G.S. Rockaway Dev., Inc., 206 A.D.2d 417, 417, 614 N.Y.S.2d 443, 444 (2d Dep't 1994) (dismissing claims of tortious interference with contract against a shareholder, director, and officer of a corporation for ordering the corporation to breach its contract with the plaintiff, where the defendant's actions were clearly taken in his corporate capacity); Giblin v. Murphy, 97 A.D.2d 668, 670, 469 N.Y.S.2d 211, 214-15 (3d Dep't 1983) (holding that once a court pierces the corporate veil, a corporation's shareholders cannot be held liable for tortiously interfering with contracts of the company), appeal dismissed, 62 N.Y.2d 605, 479 N.Y.S.2d 1025, 468 N.E.2d 57 (1984); Holloway v. Skinner, 898 S.W.2d 793, 797 (Tex.1995) ("When there is a complete identity of interests [between the party to the contract and the alleged tortfeasor], there can be no interference as a matter of law."); Schoellkopf v. Pledger, 778 S.W.2d 897, 902-04 (Tex.Ct.App.1989) (holding that "individuals who own, control, and dominate a closely held corporation" cannot tortiously interfere with their corporation's contracts)
 
 
 [4]
 Republic of Italy v. De Angelis, 206 F.2d 121, 131 (2d Cir.1953) (Clark, J., concurring) ("[D]irectors, officers, and others interested in a corporation and acting in good faith in the corporate interest are not to be held [liable] for corporate actions which may constitute breaches of contract."); Morast v. Lance, 631 F.Supp. 474, 482 (N.D.Ga.1986) (holding that, under Georgia law, directors who ordered their corporate subsidiary to fire plaintiff could not be held liable for tortious interference with his employment rights, because they were not "third parties" in relation to the employment relationship), aff'd, 807 F.2d 926 (11th Cir.1987); Swager v. Couri, 77 Ill.2d 173, 187-91, 32 Ill.Dec. 540, 545-47, 395 N.E.2d 921, 926-28 (1979) (explaining that "corporate officers who, 'in accordance with their business judgment and discretion,' interfere with their corporation's contractual relations lack the requisite 'malice' and therefore are not liable in tort") (citation omitted); King v. Driscoll, 418 Mass. 576, 587, 638 N.E.2d 488, 494-95 (1994) (rejecting a claim of tortious interference with contract against a corporate officer, for failure to show that his actions were prompted by "a spiteful, malignant purpose, unrelated to the legitimate corporate interest") (citation omitted); Murray v. Ray, 862 S.W.2d 931, 934-35 (Mo.Ct.App.1993) (holding that a person with an economic interest in a contract cannot be held liable for inducing a breach of the contract even though motivated by self-interest, in the absence of proof that the breach was accomplished through improper means such as misrepresentation of fact, threats, violence, defamation, or restraint of trade); Kaplan v. Heinfling, 136 A.D.2d 34, 41, 526 N.Y.S.2d 73, 77 (1st Dep't) (dismissing a claim of tortious interference with employment brought by a fired attorney against the president of his former employer), appeal denied, 72 N.Y.2d 810, 534 N.Y.S.2d 938, 531 N.E.2d 658 (1988); Embree Constr. Group, Inc. v. Rafcor, Inc., 330 N.C. 487, 498-501, 411 S.E.2d 916, 924-26 (1992) (holding that if the acts of a corporate officer in inducing his company to breach a contract have been done in the interest of the corporation, then the officer is not liable for tortious interference with contract); Eads v. American Bank, N.A., 843 S.W.2d 208, 210-11 (Tex.Ct.App.1992) (holding that, when acting in what they believed to be the best interests of the bank, officers and directors of the bank were privileged to interfere with the employment contract of a bank employee because they had a "right in the subject matter" that was "equal or superior" to that of the fired employee)
 
 
 [5]
 Boulevard cites Lester v. Resort Camplands International, Inc., 27 Conn.App. 59, 605 A.2d 550 (1992), for the proposition that a simple breach of contract is actionable under CUTPA. But as a subsequent Connecticut decision has explained, Lester involved a defendant who lied to entice the plaintiffs to enter into a contract. A. Secondino & Son, 1994 WL 728775, at * 3 n. 1 (distinguishing Lester from a case involving simple breach of contract). We note further that the defendant in Lester defrauded individual consumers--a constituency entitled to special solicitude under CUTPA