Imad RAAD, Plaintiff,

v.

WAL–MART STORES, INC., Defendant.

No. 4:97CV3015.

United States District Court,
D. Nebraska.

July 21, 1998.

James A. Eske, Kile W. Johnson, Barlow, Johnson, Flodman, Sutter, Guenzel & Eske, Douglas W. Marolf, Lincoln, NE, for Plaintiff.

Kevin Colleran, Cline, Williams, Wright, Johnson & Oldfather, Lincoln, NE, for Defendant.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This case involves a dispute between merchants. There is no doubt that Wal–Mart Stores, Inc., (Wal–Mart) breached its contract to sell and deliver wiper blades to its customer, Imad Raad (Raad). Wal–Mart erroneously delivered the wrong kind of wiper blades and, as a result, Raad exported the wrong blades to Lebanon. The jury found a breach of contract and awarded Raad $157,945 in damages.

The more difficult question is whether Wal–Mart also violated Nebraska's Consumer Protection Act, Neb.Rev.Stat. §§ 59–1601 to –1623 (Michie 1995). The parties have agreed that the Consumer Protection Act claim is a non-jury matter. *See State ex rel. Douglas v. Schroeder,* 222 Neb. 473, 477, 384 N.W.2d 626, 629–30 (1986) (since the Act "seeks to prevent prejudicial conduct rather than merely compensate such damage as may flow therefrom[,]" there is no right to a jury trial under Nebraska law for Consumer Protection Act claims). The parties have also agreed that I should resolve that claim on the evidence presented to the jury.

After considering the trial record and the well-written briefs, I now present my findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. Judgment will be entered for Wal–Mart on the Nebraska Consumer Protection Act claim.

## I. FINDINGS OF FACT

### The Parties and the Case

1. Plaintiff, Imad Raad, is a resident of Lincoln, Nebraska.

2. The plaintiff is a United States citizen. The plaintiff has resided in the United States for many years. He was raised in Lebanon, and some members of his family reside in that country now. The plaintiff is well-educated, speaks Arabic, French, and English, and he operated a successful retail business in America before trying his hand at exporting. The transaction involved in this case was Raad's first attempt at exporting.

3. The defendant, Wal–Mart Stores, Inc., is a Delaware corporation with its principal place of business in Bentonville, Arkansas. SAM'S Club is a division of Wal–Mart. Among other activities, SAM'S Club sells goods at wholesale to other merchants for export. Mr. Raad was introduced to SAM'S Club by a relative who was a businessman in the Detroit, Michigan, area.

4. This Court has jurisdiction under 28 U.S.C. § 1332.

### The Problem

5. On or about January 11, 1996, the plaintiff purchased from SAM'S Club in Utica, Michigan, 420 cases of double-pack Trico wiper blades for the sum of $28,980, which the plaintiff paid in full by cashier's check.

6. The goods purchased by plaintiff were to be picked up from SAM'S Club in Utica, Michigan, by Arrow Cargo, Inc., for export. Arrow Cargo, Inc., was hired by the plaintiff to pick up the wiper blades and deliver them to Beirut, Lebanon.

7. The defendant was aware at the time of purchase that the plaintiff intended to resell the goods in Lebanon.

8. On or about March 6, 1996, Wal–Mart erroneously made available for pick up 420 cases of single-pack Pylon wiper blades to Arrow Cargo, Inc., instead of the double-pack Trico blades. Arrow Cargo delivered the nonconforming goods to Lebanon. On or about April 15, 1996, the plaintiff notified the defendant that single-pack Pylon wiper blades had been received rather than the double-pack Trico wiper blades. The plaintiff gave notice to the defendant from Beirut, Lebanon.

9. How this problem arose, what happened to Mr. Raad as a result of the problem, and the actions of Wal–Mart are described below.

### Mr. Raad Seeks a Price Quote from Wal–Mart

10. In September 1995, the plaintiff requested a price quote from the defendant's SAM'S Club in Utica, Michigan, for a quantity of double-pack Trico wiper blades. At this

time the plaintiff was visiting his sister and brother-in-law, who resided in Rochester, Michigan, and who owned a mini-mart gas station for which they regularly obtained merchandise from the Utica SAM's Club.

11. At the time plaintiff made his request for a price quote, the double-pack Trico wiper blades were the only brand of wiper blades that were sold by SAM's Club. The retail price of the Trico blades was $7.99 per pair.

12. The plaintiff requested the price quote by showing the Trico blades that were in stock at the SAM's Club in Utica to John Ardelean, the store manager. Mr. Ardelean subsequently showed the Trico blades to Linda Hammond, the former Business Development Manager of the SAM's Club in Utica, as well as other SAM's Clubs in the area, and requested her to obtain the price quote.

13. Ms. Hammond testified that she telephoned Debra Connell, a buyer in the SAM's Export Department in Bentonville, Arkansas, and requested a price quote for the double-pack Trico wiper blades, providing Ms. Connell with the product identification (SKU) number that was shown on the Trico package.

14. Ms. Hammond also testified that, as instructed by Ms. Connell, she followed up this telephone conversation with a PROFS (computer e-mail) message in which she again identified the Trico blades by name and by product identification number.

15. Debra Connell in her testimony denied having such a conversation with Ms. Hammond. She also testified that she could not find the Hammond PROFS message in hard copy in her file folder or on her computer.

16. Debra Connell testified that she received a note (Exhibit 9) from Scott Burford, the Director of SAM's Club Wholesale Trading Department in Bentonville, which referenced "Club # 6664" (Utica) and "Linda Hammond—BDM" and stated: "The member has $30,000 to spend on in-expensive windshield wipers. They want: 16"–18" 90% of purch[ase]. 20"–22" 10% of purch[ase]. Look for a Wal–Mart cheapy for Lebanon."

17. Scott Burford testified that he wrote this note (Exhibit 9) after receiving a telephone call from Linda Hammond, but that he had no independent recollection of the call.

18. Linda Hammond denied making the statements that are contained in the note (Exhibit 9) to anyone at SAM's Club or Wal–Mart. She further testified that she had been instructed that she could only sell SAM's Club merchandise.

19. Debra Connell testified that she only consulted the Wal–Mart computer system in obtaining a price quote for the wiper blades. Separate computer systems are maintained for Wal–Mart and SAM's Club merchandise.

20. A price quote of $1.38 a package, or $69.00 per case, was provided to Linda Hammond by return PROFS (Exhibit 8), dated September 11, 1995. The price quote did not identify the brand of blades, but Debra Connell testified that it was for single-pack Pylon wiper blades which were sold in Wal–Mart stores.

21. Linda Hammond testified that she understood the price quote was for the double-pack Trico blades, and that she provided the quote to the plaintiff on this basis. In other words, the plaintiff was given a price quote for wiper blades that did not conform to his specifications.

### Using the Erroneous Quote, Raad Makes a Deal in Lebanon

22. After obtaining the price quote, the plaintiff traveled to Lebanon, where he showed the double-pack Trico blades that he had obtained from SAM's Club to an importer in Beirut by the name of Mohammed Dib Itani. The plaintiff had not previously met Mr. Itani, but contacted him after receiving references from clients of the plaintiff's brother, who resides in Beirut.

23. The plaintiff offered to sell Mr. Itani the Trico blades for a delivered price of $8.00 per package. The plaintiff testified that he based his resale price on three factors: (a) the SAM's Club retail price of $7.99; (b) similar, but lesser-quality, blades were selling at Murray's Auto Parts in Rochester, Michigan, for $7.69, as to which the plaintiff received a price quote of $1.79 for export; and (c) wiper blades were selling in Lebanon for a minimum of $12.00 a pair.

24. During this same trip to Lebanon, the plaintiff contacted two other importers, Messrs. Kobeissi and Beydoun, who expressed interest in purchasing water filters and oil from the plaintiff.

25. After the plaintiff returned to the United States, Mr. Itani telephoned to order a 20–foot container of the double-pack Trico blades at the $8.00 delivered price. Mr. Itani also told the plaintiff that he would order three or four shipments per year if the plaintiff would agree not to sell the Trico blades to other importers in Lebanon.

26. The plaintiff thereafter contacted Linda Hammond to find out the quantity of blades that would fit into a 20–foot container. The plaintiff told Ms. Hammond to obtain additional information from Arrow Cargo, Inc., of Dearborn, Michigan, whom the plaintiff had contacted about shipping the blades to Lebanon.

27. Linda Hammond sent a PROFS (Exhibit 10) to Debra Connell on November 15, 1995, requesting case dimensions and the number of cases per pallet. The requested information was sent to Ms. Hammond by return PROFS (Exhibit 11) on November 16, 1995, which again did not state the brand of wiper blades involved.

28. The plaintiff was subsequently advised by Linda Hammond that 420 cases of the double-pack Trico blades could be loaded into a 20–foot container; the plaintiff so informed Mr. Itani, and this quantity was agreed upon.

29. The plaintiff entered into an oral contract with Mohammed Dib Itani for the sale of 420 cases of double-pack Trico blades for a total delivered price of $168,000.

### Raad Places the Order with Wal–Mart, But It Orders the Wrong Blades

30. On January 5, 1996, the plaintiff placed his order for the double-pack Trico blades with Linda Hammond by telephone from Lincoln, Nebraska. The plaintiff also faxed Ms. Hammond on that date a list of items that were required to be included in the SAM's Club invoice for purposes of exporting the blades to Lebanon (Exhibit 12). Ms. Hammond was aware of the fact that the plaintiff anticipated repeat orders.

31. Linda Hammond immediately telephoned the order to Debra Connell on January 5, 1996, and followed up with a PROFS message (Exhibit 13) which, however, did not specify the brand of wiper blades.

32. In her January 5th PROFS message (Exhibit 13), Linda Hammond requested samples of the ordered items. Debra Connell testified that she made no response to this request because it was not "standard procedure" for the SAM's Club buyers in Arkansas to obtain samples. Linda Hammond testified that she made repeated requests to Debra Connell for samples of the ordered items, but none were provided.

33. On January 10, 1996, Debra Connell prepared an order for 420 cases of single-pack Pylon wiper blades. This required inputting the Pylon blades as a new item into the SAM's Club computer system (Exhibit 14) and preparing a purchase order (Exhibit 15). A copy of the purchase order was not sent to Linda Hammond, as Ms. Connell testified that "standard procedure" was not to copy the local SAM's Club unless specifically requested.

34. The testimony of the defendant's employees establishes that Linda Hammond or Debra Connell erroneously ordered single-pack Pylon wiper blades rather than the double-pack Trico wiper blades which the defendant stipulated that it sold to the plaintiff.

35. The plaintiff was required to make full payment before SAM's Club would process the order for the wiper blades. He was informed that the blades would be delivered to the SAM's Club in Utica within two to three weeks.

36. On January 11, 1996, the plaintiff express-mailed Linda Hammond a cashier's check (Exhibit 16) from Norwest Bank in Lincoln, Nebraska, in the amount of $28,980.

37. Linda Hammond received the check on January 11, 1996, and notified the defendant's buyers in Arkansas of this fact.

### Wal–Mart Processes the Wrong Order

38. A cash register receipt (Exhibit 17) was rung up at the Utica SAM's Club on January 12, 1996. The receipt did not identi-

fy the brand of blades, but only showed a stock number which would have been obtained from the SAM's Club computer system.

39. An invoice for the wiper blades (Exhibit 17) dated January 30, 1996, was also prepared by the Utica SAM's Club. The invoice again identified the blades only by stock number.

40. Linda Hammond did not verify the stock numbers shown on the receipt or invoice (Exhibit 17). Neither of these documents were provided to the plaintiff until after the wiper blades had been delivered.

41. On January 29, 1996, Sandy Brummett, a Wal–Mart employee in Arkansas working under the supervision of Debra Connell, sent a fax (Exhibit 18) to the Utica SAM's Club indicating that word had been received from "the vendor" that shipment of the blades would be delayed for another three weeks. Linda Hammond in turn faxed a copy of this notice to the plaintiff, who, after consulting with Mr. Itani, agreed to the late delivery.

42. The plaintiff requested Linda Hammond to notify Arrow Cargo Company when the wiper blades arrived in Utica, to supervise the delivery of the wiper blades to Arrow Cargo, and to provide Arrow Cargo with all necessary paperwork for the shipment to Lebanon. To assist Mr. Raad, Linda Hammond agreed to this request.

43. Linda Hammond testified that she checked with the SAM's Club buyers in Arkansas on a weekly basis regarding the expected delivery date of the wiper blades. She also testified that she wanted to contact Trico directly to find out when delivery could be expected, but that she was informed by her regional supervisor, Roger Mumford, that that was not her job.

### Wal–Mart Delivers the Wrong Blades to the Cargo Company

44. On March 6, 1996, 420 cases of single-pack Pylon wiper blades were delivered to the SAM's Club in Utica. As agreed, Linda Hammond notified Arrow Cargo Company to send a container to pick up the blades, which was accomplished that same day.

45. In making the delivery to Arrow Cargo, Linda Hammond did not inspect the goods, which were sealed into the container at the SAM's Club loading dock. Ms. Hammond prepared and signed a bill of lading (Exhibit 20) which again identified the blades only by their stock number, and which noted the container and seal number. Ms. Hammond testified that she obtained the stock numbers from the SAM's Club packing list (Exhibit 21) which was included with the shipment, and which also contained no identification of the manufacturer of the blades. Ms. Hammond gave this documentation to the driver from Arrow Cargo, and retained copies for her file and to give to the plaintiff. Ms. Hammond testified that she was unaware that single-pack Pylon wiper blades had been loaded into the cargo container instead of the double-pack Trico wiper blades that she had sold to the plaintiff.

46. Linda Hammond telephoned the plaintiff on March 6, 1996, to inform him that the blades had arrived and had been picked up by Arrow Cargo.

### Mr. Raad Pays Wal–Mart and Goes to Lebanon

47. On March 7, 1996, the plaintiff flew to Michigan, where he obtained copies of the paperwork that Linda Hammond had provided to Arrow Cargo Company. At no time was the plaintiff informed that single-pack Pylon wiper blades had been delivered instead of the double-pack Trico wiper blades that he had purchased, nor was this fact disclosed by any of the paperwork.

48. Additional documentation for export included a certificate of origin (Exhibit 67), which was prepared by Arrow Cargo, and which identified the manufacturer of the shipped blades as Trico Products Corp. of Tucker, Georgia. The plaintiff did not provide Arrow Cargo with any of the information shown in this document; rather, the plaintiff had instructed Arrow Cargo to obtain any necessary information for shipment from Linda Hammond, as she had agreed to provide such information.

49. On March 6, 1996, the plaintiff paid Arrow Cargo and the shipping company, Croatia Line, a total of $3,455 by cashier's checks (Exhibits 73 & 74) for transporting the wiper blades to Beirut, Lebanon.

50. The plaintiff flew to Beirut in late March 1996 for the purpose of making delivery of the wiper blades to his customer and receiving the agreed payment of $168,000. To make this trip, the plaintiff purchased a round-trip airline ticket for the sum of $1,500.

51. The single-pack Pylon blades arrived in Lebanon on or about April 15, 1996, whereupon the plaintiff's customer accused him of committing fraud, and he was threatened with prosecution by Mr. Itani's attorney. The plaintiff understood that under Lebanese law he could be imprisoned as soon as a complaint was filed against him. Mr. Itani's attorney offered to delay bringing charges if the plaintiff would surrender his United States passport to insure that he did not leave the country. The plaintiff agreed to this after consulting with an attorney in Lebanon.

52. The Pylon blades, which were unacceptable to Mr. Itani because of the difference in quality and quantity, remained on the dock in Beirut. The $168,000 purchase price, which was being held in escrow, was returned to Mr. Itani.

### Mr. Raad Notifies Wal–Mart of the Mistake

53. On April 15, 1996, immediately upon his discovery that the wrong blades had been delivered, the plaintiff telephoned Linda Hammond, informing her of this fact and relating his problems with Mr. Itani. He requested that Wal–Mart immediately send him the double-pack Trico blades that he had purchased, that Wal–Mart pay the shipping charges for returning the Pylon blades to the United States, and that Wal–Mart provide him with a written acknowledgment that the delivery of the wrong blades was Wal–Mart's mistake.

54. The plaintiff testified that he was informed by Mr. Itani that he could regain his passport and that fraud charges would not be filed if Wal–Mart would provide a written acknowledgment of responsibility for shipping the wrong blades.

55. In her April 15th telephone conversation with the plaintiff, and in subsequent conversations, Linda Hammond admitted that Wal–Mart had delivered the wrong blades, and she promised to do what she could to rectify the situation. Ms. Hammond testified that the plaintiff sounded frantic when she talked to him.

56. The initial telephone conversation was followed up by a fax to Linda Hammond (Exhibit 23) which the plaintiff dictated to his girlfriend, LaVerne Conard, in Lincoln, Nebraska, at Linda Hammond's request. Linda Hammond also sent a fax to LaVerne Conard (Exhibit 24) on April 15, 1996, which identified the stock numbers for the double-pack Trico blades, and requested a return confirming fax. Ms. Conard rewrote this information and faxed it back to Linda Hammond to confirm that Raad sought to replace the Pylon blades with the correct order. Ms. Conard sent the requested return fax (Exhibit 25) on April 15, 1996.

### Wal–Mart Employees Investigate

57. Linda Hammond also sent a PROFS message (Exhibit 27) to Scott Burford on April 15, 1996, discussing replacement of the blades, shipping costs, and the need for something in writing from Wal–Mart. In response, Sandy Brummett was instructed to find out the cost of replacement. Ms. Brummett determined that single-pack Trico blades would cost Wal–Mart $2.80 each in the 16″ and 18″ sizes, and $3.48 each in the 20″ size, as reflected in her notes (Exhibit 47).

58. Sandy Brummett determined that Wal–Mart could sell the single-pack Trico blades for $2.95 each in the 16″ and 18″ sizes, and for $3.67 in the 20″ size. Brummett also learned that the double-pack Trico blades were unavailable because the manufacturer had none in stock. Ms. Brummett sent this information by memo (Exhibit 29) to Linda Hammond.

59. Linda Hammond, at the direction of her regional supervisor, Roger Mumford, drafted a letter (Exhibit 33) which offered to sell Mr. Itani 21,000 Trico blades for $61,950 (one-half of the plaintiff's original order), as to which payment in full would be required by Wal–Mart prior to shipment. Ms. Hammond sent the draft letter to Mr. Mumford on April 17, 1996, with a cover letter (Exhibit 32) explaining that the draft letter was "addressed to the merchant in Lebanon who purchased the wiper blades from our member, Imad Raad," and stating that the plain-

tiff required a letter stating that Wal–Mart would be responsible for return shipping charges on the Pylon blades. The draft letter was never sent, as testified by Scott Burford and as noted by him on his copy of the draft letter (Exhibit 51). Ms. Hammond, however, did inform Mr. Raad on or about April 16, 1996, that the double-pack Trico blades were not available, but the single-pack Trico blades could be obtained.

### Mr. Burford Speaks with Mr. Raad

60. On or about April 29, 1996, the plaintiff had a telephone conversation with Scott Burford. The plaintiff explained the situation to Mr. Burford and requested that Wal–Mart replace the blades, pay return shipping charges, and provide a letter stating that the error was committed by Wal–Mart. Mr. Burford acknowledged that he was aware of the plaintiff's requests for corrective action, and testified that these matters could have been discussed during this telephone conversation, as reflected by his notes (Exhibit 39) which mention replacement and shipping costs.

61. During this telephone conversation, Scott Burford told the plaintiff that the Trico blades that Mr. Raad had purchased were not available. Mr. Burford was aware at this time that single-pack Trico blades were available, as evidenced by his handwriting on the documents that were prepared by Sandy Brummett (Exhibits 48 and 51). However, Sandy Brummett had determined that the double-pack Trico blades were unavailable and Mr. Burford was aware of this information. Mr. Burford also had in his possession a note from Debra Connell (Exhibit 42) which stated that Trico still manufactured the double-pack. Although Trico still manufactured the double-pack blades, there is no evidence that a supply of those blades was in fact available to Wal–Mart. On the contrary, the double-pack blades were manufactured especially for SAM'S Clubs and the manufacturer had none in stock. As noted earlier, Mr. Raad had been informed by Ms. Hammond on about April 16, 1996, that the Trico double-pack blades were not available, but the single-pack Trico blades could be obtained.

62. Scott Burford testified that he thought the plaintiff and Mr. Itani were "working together." However, Mr. Burford also referred to Mr. Itani as the plaintiff's "customer" in a fax (Exhibit 53) dated April 30, 1996.

### Wal–Mart Agrees to a Settlement

63. Mr. Itani had told Mr. Raad that he would take the Pylon blades in return for a payment of $20,550; that is, he agreed to a settlement equal to the nonconforming goods plus one-half of the purchase price that was paid by the plaintiff ($14,490 ($28,980 divided by 2)), plus expenses ($6,060) for dock charges and penalties incurred because of the erroneous description of the goods in the certificate of origin. The payment was to be made to Mr. Itani's attorney. The plaintiff faxed this offer to Scott Burford on April 30, 1996, with instructions to send payment to Mr. Itani's attorney (Exhibit 36).

64. Scott Burford accepted the Itani offer by return fax (Exhibit 37) dated April 30, 1996, and requested a letter from Mr. Itani accepting the settlement. Mr. Burford stated in such fax: "I believe that this situation was a mis-understanding [sic] and there was no error committed by SAM's Club."

65. Although Scott Burford wrote on his copy of this fax (Exhibit 37) that it was "agreed by Linda Hammond," Ms. Hammond testified that she never saw the fax and was unaware of the Itani offer or the payment made by Wal–Mart.

66. While it is not entirely clear, it appears that the actual cost to Wal–Mart of the $20,550 payment was $10,315, since it made a profit of $5,980 on the sale to the plaintiff, and it was receiving $4,255 as a payment from the wiper blade vendor (Exhibit 40).

67. Mr. Itani faxed Scott Burford the requested settlement acceptance letter (Exhibit 2) on May 1, 1996, through the plaintiff. In that fax, the plaintiff instructed that the check should be made payable to himself rather than to Mr. Itani's attorney. The plaintiff thereafter had a telephone conversation with Mr. Burford in which he explained that the change in payee was to insure that the plaintiff got his passport back.

68. Scott Burford sent a fax (Exhibit 3) to the plaintiff on May 3, 1996, indicating that the check, made payable to Raad, was being mailed, and stating: "As we have stated be-

fore, we do not know where the confusion or mis-understanding [sic] about this order occurred. We are glad that this can be resolved, in a timely manner." Burford sent the check by express mail. At this time, Burford and Wal–Mart believed that the dispute had been resolved. Raad had no further contact with Wal–Mart until after he returned to the United States and hired counsel.

### Mr. Itani and Others Demand More From Mr. Raad

69. After the Wal–Mart check arrived in Lebanon, the plaintiff endorsed it over to Mr. Itani. The check took 35 days after receipt to clear the bank. In the interim, the plaintiff was required to pay import taxes of $8,000 on the Pylon blades and transportation costs of $3,000 in making delivery of the blades to Mr. Itani's warehouse.

70. In addition to endorsing over the Wal–Mart check and paying the import taxes and transportation costs for delivery of the blades to Mr. Itani, the plaintiff, in order to regain his passport, was required to pay $30,000 to Mr. Itani's distributors, who were also represented by Mr. Itani's attorney, and $3,000 in legal fees to the attorney. The plaintiff made such payment of $33,000 by means of a loan from his brother, after consulting with the Raad family attorney in Lebanon.

71. Mr. Raad regained his passport after making the $33,000 payment and he left Lebanon on the first available flight on July 1, 1996. Because the plaintiff's original round-trip airline ticket had expired, he incurred an additional expense of $1,700 for this return trip.

72. While in Lebanon, the plaintiff spent $1,200 for overseas telephone calls and faxes to the defendant in attempting to get the defendant to take corrective action.

73. The plaintiff received no payment from Mr. Itani.

---

1. Nebraska's Consumer Protection Act (Act) mirrors federal law. *Compare* 15 U.S.C. § 45(a)(1) ("[U]nfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.") *with* Neb.Rev.Stat. § 59–1602 (Michie 1995) ("[U]nfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful."). This similarity exists because the

## II. CONCLUSIONS OF LAW

Since it is undisputed that Nebraska law applies in this diversity case, the ultimate legal issue is whether Wal–Mart's conduct amounted to an "unfair or deceptive act[ ] or practice[ ] in the conduct of" its business in violation of Neb.Rev.Stat. § 59–1602 (Michie 1995).[1] I conclude that Wal–Mart's conduct, although a breach of its contract with Mr. Raad, did not constitute an unfair or deceptive trade practice. My reasons for this decision are set forth below.

### A. The Principles

Wal–Mart essentially stipulated to a breach of contract. It agreed in the pretrial conference order that Raad had purchased Trico double-pack blades from Wal–Mart, that Raad paid Wal–Mart for the Trico blades, and that Wal–Mart instead delivered Pylon single-pack blades. (Pretrial Conference Order ¶ B (Uncontroverted Facts) (filing 39).) Regardless of the stipulation, at trial Raad proved a breach of contract under Nebraska law because Wal–Mart delivered Pylon blades instead of the Trico blades called for in the contract. For purposes of the following analysis, I therefore assume that Raad has proven a breach of contract.

Mr. Raad argues that the conduct of Wal–Mart was both "unfair" and "deceptive" within the meaning of Neb.Rev.Stat. § 59–1602 (Michie 1995). Accordingly, Raad asserts that he is a person "who is injured in his business ... by a violation of section[ ] 59–1602" and, as a result, he "may bring a civil action ... to recover the actual damages sustained by him ... together with the costs of the suit, including a reasonable attorney's fee ...." Neb.Rev.Stat. § 59–1609 (Michie 1995).

Wal–Mart does not dispute that under Nebraska law the plaintiff has a private right of action under the Act. Wal–Mart argues, however, that even though it breached its con-

---

Federal Trade Commission suggested that the states adopt their own versions of this federal law. *See* Stephen Gardner & Albert Norman Shelden, *See Dick and Jane Sue: A Primer on State Consumer Protection Laws*, C801 ALI–ABA 321, 327–28 (1992), *available in* WL, ALI–ABA Database.

tract with Raad, it did not engage in an "unfair" or "deceptive" trade practice.

██ The terms "unfair" and "deceptive" are not defined by the Act.[2] Furthermore, no Nebraska case defines the meaning of the words "unfair" or "deceptive" as used in the Act. Accordingly, I must try to predict how the Nebraska Supreme Court would define and then apply those words to this case. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). *See also Salve Regina College v. Russell,* 499 U.S. 225, 226, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991).

When deciding what these words mean in the context of a contract dispute between merchants (as is the case here), the well-reasoned opinions of four different federal Courts of Appeal inform my decision. In all of these rulings, a state law containing language nearly identical to Nebraska's was at issue and a contract between businessmen was also at the heart of the case.

### 1. The First Circuit and Massachusetts Law

In *Ahern v. Scholz,* 85 F.3d 774, 798–800 (1st Cir.1996), the First Circuit considered the Massachusetts version of Nebraska's Consumer Protection Act. In Massachusetts, like Nebraska, " 'unfair or deceptive acts or practices in the conduct of any trade or commerce' " are unlawful. *Id.* at 796 n. 14 (quoting Mass. Gen. L. ch. 93A, § 2.)

In *Ahern* a professional songwriter had breached his contract by failing to pay a manager an agreed-upon percentage of royalties received from the sale of an album.

The district court had found in favor of the manager on the Massachusetts version of the Consumer Protection Act because the writer had engaged in a "deliberate and blatant attempt to deprive the Plaintiff Ahern of monies rightfully due and owing to him as royalties ...." *Id.* at 797. Instead of properly deducting $0.5 million in recording costs from royalties, the defendant had unreasonably deducted $4.2 million in costs when calculating the manager's fee. *Id.* at 798.

The First Circuit reversed, and held that the district court had erred as a matter of law in finding a violation of the Massachusetts law. *Id.* at 800. The court found that while the songwriter had breached his contract with the agent, he had not concealed the basic facts. *Id.* at 799. Thus, "his acts did not rise to the level of rascality required" by the law. *Id.* at 800. The court set forth two principles.

Initially, the court held that a plaintiff making an "unfair" or "deceptive" trade practice claim must show that the defendant's actions: (a) fell " 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness' "; or (b) were " 'immoral, unethical, oppressive or unscrupulous' "; and (c) caused " 'substantial injury.' " *Id.* at 798 (quoting *Quaker State Oil Refining Corp. v. Garrity Oil Co., Inc.,* 884 F.2d 1510, 1513 (1st Cir.1989) (quoting *PMP Associates, Inc. v. Globe Newspaper Co.,* 366 Mass. 593, 321 N.E.2d 915, 917 (1975))).[3]

---

**2.** Nebraska has also adopted the Uniform Deceptive Trade Practices Act. Neb.Rev.Stat. § 87–301, *et seq.* (Michie 1995). The plaintiff does not rest his claim on this entirely separate statutory scheme. (Pl.'s Mem. Br. Supp. Cons.Prot. Act Cl. at 28.) The Uniform Deceptive Trade Practices Act was not alleged in the complaint (filing 14) or the pretrial conference order (filing 39 ¶ C) as a basis for the plaintiff's claim. I therefore express no opinion on whether the plaintiff could prevail under that law. However, I also observe that the Uniform Deceptive Trade Practices Act does not preempt the plaintiff's suit under the Consumer Protection Act because that law "does not affect unfair trade practices otherwise actionable at common law or under other statutes of this state." Neb.Rev.Stat. § 87–302(c) (Michie 1995).

**3.** This test, known as the "cigarette rule," was also used by the Supreme Court when interpreting the meaning of "unfair" under the Federal Trade Commission Act. *FTC v. Sperry & Hutchinson Co.,* 405 U.S. 233, 244–45 n. 5, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972). Although the concepts are similar, "unfair" and "deceptive" have slightly different meanings. *See, e.g., American Financial Services Ass'n v. FTC,* 767 F.2d 957, 979 n. 27 (D.C.Cir.1985) (the "distinction between the deception rationale and the unfairness rationale tends to become obfuscated"; "A practice is deceptive when the consumer is forced to bear a larger risk than expected (*e.g.,* the consumer is misled) whereas a practice is unfair when the consumer is forced to bear a larger risk than an efficient market would require."), *cert. denied,* 475 U.S. 1011, 106 S.Ct. 1185, 89 L.Ed.2d 301 (1986).

Next, the court made clear that the "simple fact that a party knowingly breached a contract does not raise the breach to the level of a ... violation" of the consumer protection law. *Id.* at 798. Rather, the plaintiff must show that the breach of contract involves a sufficient "level of rascality," and such things as extortion or egregious concealment of facts are the type of "rascality" targeted by the statute. *Id.* at 799–800. In short, " '[t]he objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.' " *Id.* at 798 (quoting *Quaker State,* 884 F.2d at 1513) (quoting *Levings v. Forbes & Wallace, Inc.,* 8 Mass.App.Ct. 498, 396 N.E.2d 149, 153 (1979)).

An example of a sufficient level of "rascality" is found in *Cambridge Plating Co., Inc. v. Napco, Inc.,* 85 F.3d 752, 769 (1st Cir.1996). There a merchant sold a wastewater treatment system for use in an electroplating business. The seller knowingly failed to install an integral component of the system called a static mixer. The system then began to malfunction and instead of telling the truth about the failure to install the static mixer, the seller attributed the failure of the system to operator error. As a consequence of this added deception, the buyer's damages were magnified.

The court acknowledged that "the dimensions of [consumer protection] liability are difficult to discern." *Id.* at 769. Nevertheless, since the conduct of the seller "amount[ed] to an intentional misrepresentation and willful breach of warranty," *id.* at n. 18, the First Circuit affirmed the district court's judgment for the buyer, labeling the actions of the seller as "unscrupulous." *Id.* at 770.

### 2. The Second Circuit and Connecticut Law

In *Boulevard Associates v. Sovereign Hotels, Inc.,* 72 F.3d 1029, 1038–39 (2nd Cir. 1995), the court considered Connecticut's Unfair Trade Practices Act, Conn. Gen.Stat. §§ 42–110a to 42–110q. Connecticut law, as does Nebraska's law, prohibits " 'unfair or deceptive acts or practices in the conduct of

any trade or commerce.' " *Id.* at 1038 (quoting Conn. Gen.Stat. § 42–110b(a)).

*Boulevard Associates* involved a contract for lease of hotel property, with an agreement by the lessor to build a hotel that was to be managed by the lessee. The hotel was built, but it did not generate enough money to pay the lease. The lessee withheld rent in an effort to obtain a renegotiated rental price, and later failed to pay the rent altogether. Among other things, the lessor sued for breach of contract and violations of Connecticut's consumer protection law. The district court found for the lessor on both of these claims. As to the consumer protection law claim, the Court of Appeals reversed.

The court first noted that Connecticut had adopted the "cigarette rule"—in order to be unfair, the practice must violate established concepts of fairness or the practice must be immoral or the like—developed by the Federal Trade Commission. *Id.* at 1038.[4] With that in mind, the court then considered whether the "cigarette rule" was violated by a "breach of contract standing alone." *Id.* at 1039.

In Connecticut the "vast majority" of the courts had held that a " 'simple contract breach is not sufficient to establish a violation' " of the law. *Id.* at 1038–39 (quoting *Chaspek Mfg. Corp. v. Tandet,* 1995 WL 447948, at *12 (Conn.Super.Ct. June 16, 1995) (quoting *Aussenhandel v. Grant Airmass Corp.,* 2 Conn. L. Reptr. 590, 1990 WL 283750 (Conn.Super.Ct. Oct.15, 1990) (Lewis, J.))). The court then held that in order to prove a violation of the consumer protection law in Connecticut, a plaintiff must allege and prove "aggravating circumstances surrounding the breach." *Id.* at 1039. Since the lessee had done no more than "back out of a business venture that was losing money[,]" the law had not been violated. *Id.*

### 3. The Fourth Circuit and North Carolina Law

North Carolina's Unfair and Deceptive Trade Practices Act, like Nebraska's law, prohibits " 'unfair or deceptive acts or practices in or affecting commerce.' " *Bartolomeo v. S.B. Thomas, Inc.,* 889 F.2d 530, 534

---

**4.** *See supra* note 3.

(4th Cir.1989) (quoting N.C. Gen.Stat. § 75–1.1(a) (1988)). In *Bartolomeo,* the court affirmed the district court's grant of summary judgment on the consumer protection law claim. The Court of Appeals discussed the "deceptive" and the "unfair" rationale under the Act.

In *Bartolomeo,* the plaintiff claimed that a manufacturer falsely represented to the plaintiff-distributor that a reorganization would not lead to termination of the distributorship, and as a result, the plaintiff invested large sums of monies. Thereafter, the plaintiff claimed that the distributorship was wrongfully terminated by the defendant and the defendant engaged in post-termination misconduct, such as by delaying reimbursements to the distributor.

The court first discussed the concept of "deception." The plaintiff had claimed that he had been given "repeated assurances that he did not have 'a thing to worry about.'" *Id.* at 534. The district court ruled "as a matter of law that whatever deception he may have experienced did not rise to the level of a violation of the Act." *Id.* at 535. The Court of Appeals explained that in order to prove a "deceptive act," one must prove that "'the acts complained of possessed the tendency or capacity to mislead, or created the likelihood of deception.'" *Id.* at 534 (quoting *Chastain v. Wall,* 78 N.C.App. 350, 337 S.E.2d 150, 154 (1985) (quoting *Overstreet v. Brookland, Inc.,* 52 N.C.App. 444, 279 S.E.2d 1, 7 (1981))). The Court of Appeals "doubt[ed]" that the "statements ... [had] a deceptive quality within the meaning of the Act." *Id.* at 535.[5]

A later Fourth Circuit decision explained that in a breach-of-contract situation, "a broken promise is unfair or deceptive only if the promisor had no intent to perform when he made the promise." *Gilbane Bldg. Co. v. Federal Reserve Bank of Richmond,* 80 F.3d 895, 903 (4th Cir.1996) (citing *Kent v. Humphries,* 50 N.C.App. 580, 275 S.E.2d 176, 182–83, *modified,* 303 N.C. 675, 281 S.E.2d 43 (1981); *Overstreet v. Brookland, Inc.,* 52 N.C.App. 444, 279 S.E.2d 1, 6 (1981)). In *Gilbane,* the Fourth Circuit held that a bank did not violate the consumer protection law by allegedly breaching its building contract through such devices as intentionally delaying payment. Because there was no evidence that the bank did not intend to perform its promise when it made the contract, the Act was not violated merely because the bank may have breached the contract. *Id.* at 903–04 (citing, among other cases, *Bartolomeo* ).

The *Bartolomeo* court also considered the "unfair" rationale. The plaintiff in *Bartolomeo* had claimed that the defendant had breached the contract by wrongly terminating the distributorship and by various related post-termination acts.

The court explained that a "simple breach of contract, even if intentional, does not amount to a violation of the Act; a plaintiff must show substantial aggravating circumstances attending the breach to recover under the Act ...." *Bartolomeo,* 889 F.2d at 535 (citing *United Roasters, Inc., v. Colgate–Palmolive Co.,* 649 F.2d 985 (4th Cir.), *cert. denied,* 454 U.S. 1054, 102 S.Ct. 599, 70 L.Ed.2d 590 (1981)). The court found no such aggravating circumstances, even though the defendant allegedly: (1) delayed giving certain notices; (2) granted only a limited time to accept a settlement offer; (3) failed to deliver products; (4) tampered with documents; (5) delayed reimbursements; (6) failed to inform the plaintiff about incentive bonuses; and (7) removed products. *Id.* at 535–36. "We agree ... with the district court's legal conclusion that these acts, even if proved, would not rise to the level of a violation of the Act ...." *Id.* at 536.

**4. The Fifth Circuit and Louisiana Law**

Like Nebraska's statute, Louisiana's law declares "'unfair or deceptive acts or practices in the conduct of any trade or commerce' are illegal." *Turner v. Purina Mills, Inc.,* 989 F.2d 1419, 1422 (5th Cir.1993) (quoting La.Rev.Stat. § 51:1409). In *Turner,* a feed dealer sued a feed manufacturer claiming that after the feed dealer signed a distributorship contract, the manufacturer violated the consumer law by selling products

---

5. Ultimately, the court found that even if deception had been proven, the plaintiff had failed to prove causation. *Id.*

directly to the plaintiff's customers and through the plaintiff's competitors. After a jury found in favor of the plaintiff, the Fifth Circuit reversed, holding as a matter of law that the conduct of the manufacturer did not constitute a violation of the consumer protection law.

The court first defined an "unfair trade practice." *Id.* at 1422. Stating that the cases "have defined the range of prohibited practices quite narrowly[,]" the court stated that an "unfair trade practice" is one " 'that is unethical, oppressive, unscrupulous, or substantially injurious.' " *Id.* (quoting *Bolanos v. Madary,* 609 So.2d 972, 977 (La.App. 1992)). The court then observed that "[f]raud, misrepresentation, deception, and similar conduct is prohibited," but "mere negligence is not." *Id.* (citing *Marshall v. Citicorp Mortgage Inc.,* 601 So.2d 669, 670 (La.App.1992)).

Next, the court stated that "the statute does not provide an alternate remedy for simple breaches of contract." *Id.* (citing *State ex rel. Guste v. Orkin Exterminating Co., Inc.,* 528 So.2d 198, 202 (La.App.1988)). The court emphasized that there "is a great deal of daylight between a breach of contract claim and the egregious behavior the statute proscribes." *Id.*

With these principles in mind, the Fifth Circuit confronted the district court's determination that "Purina and Turner had contracted to do business in a 'moral, legal, and ethical manner.' " *Id.* at 1423. The plaintiff argued that Purina's conduct violated this standard, and that this contractual standard of behavior was applicable to the consumer protection law as a result of the contract. Notwithstanding this argument, the Fifth Circuit held that "intent to eliminate the competition" does not violate the law because "the statute forbids businesses to destroy each other through improper *means*" and

the evidence failed to "demonstrate[ ] that improper means were planned or used against Turner." *Id.* (emphasis in original).

### 5. The Principles Summarized

From the foregoing cases, four principles may be derived to assist us in determining what "unfair" and "deceptive" mean under Neb.Rev.Stat. § 59–1602 (Michie 1995) for cases involving contractual disputes between merchants.[6] I set forth those principles next.

■ First, in order to prove an "unfair" practice when merchants have entered into a contract, the plaintiff must either prove that the practice: (1) fell within some common-law, statutory, or other established concept of unfairness or (2) was immoral, unethical, oppressive, or unscrupulous.[7]

■ Second, in order to prove an "unfair" practice when merchants have entered into a contract, proof of a breach of contract is not sufficient. The plaintiff must additionally show that there were substantial aggravating factors associated with the breach, such as using the breach in an extortionate manner.

■ Third, in order to prove a "deceptive" practice when merchants have entered into a contract, the plaintiff must prove that the practice possessed the tendency or capacity to mislead, or created the likelihood of deception. Fraud, misrepresentation, and similar conduct are examples of what is prohibited.

■ Fourth, in order to prove a "deceptive" practice when merchants have entered into a contract, proof of a breach of contract is not enough. The plaintiff must additionally show that the promisor had no intent to perform the promise when it was made.

---

**6.** I agree with *Turner* that "what is an 'unfair [or deceptive] trade practice' " is "largely [left] to the courts to decide on a case-by-case basis." *Id.* at 1422 (citing *Marshall v. Citicorp,* 601 So.2d at 670). Thus, the principles applied in this case involving a contractual dispute between merchants may not be applicable in other circumstances.

**7.** The cases are unclear whether it would be enough to prove that the practice "causes sub-

stantial injury" without, for example, proving that the practice was also unscrupulous. Some courts (at least theoretically) see "substantial injury" as a separate basis for liability, while others see "substantial injury" as a damage issue. I do not believe that a merchant involved in a contract dispute can recover under Nebraska consumer protection law simply by proving that he or she was substantially injured without proof of culpability. In short, the statute, at least for merchants, is not a "strict liability" law.

### 6. Mr. Raad's Expansive View Distinguished

The plaintiff urges me to take a more expansive view of "unfair" and "deceptive." In fact, the plaintiff, in his very well-written brief, cites numerous cases from a variety of jurisdictions that support his argument. I reject his argument, however, because I do not believe that Nebraska would interpret the Consumer Protection Act so liberally in a case, like this one, involving a contractual dispute between two merchants.

Indeed, many of the cases cited by the plaintiff can be distinguished on the ground that they involve disputes between retail consumers and unscrupulous business people. *See, e.g., Boulevard Associates,* 72 F.3d at 1039 n. 5 (distinguishing cases because they involved "defrauded individual consumers—a constituency entitled to special solicitude" under the consumer protection law). To the extent that Mr. Raad would have me believe that he is like an unsophisticated retail consumer, I reject his argument. On the contrary, he is a well-educated multilingual businessman who grew up in the Middle East and lived for many years in America. While this was his first try at exporting, he was not especially vulnerable like the ordinary retail consumer.

In rejecting Mr. Raad's interpretation of the Consumer Protection Act, I am also informed by what the Nebraska Supreme Court has said about the purposes of the law. The Nebraska Supreme Court has stated that the "act is equitable in nature, in the sense that it seeks to prevent prejudicial conduct rather than merely compensate such damage as may flow therefrom. The monetary consequences imposed to discourage future like acts and practices are ancillary to the act's principal equitable thrust." *Schroeder,* 222 Neb. at 477, 384 N.W.2d at 630.

If the Act is primarily intended to prevent "prejudicial conduct" rather than to "merely compensate such damages as may flow therefrom," it is sensible to conclude, as other courts have, that the Nebraska statutes should not be interpreted as "an alternate remedy for simple breaches of contract."

*Turner,* 989 F.2d at 1422 (citation omitted). Like other courts, I do not think the Nebraska legislature "intended such an extraordinary alteration of the common law" as would be created by a rule that Nebraska's consumer protection law "convert[s] every contract dispute into a [statutory] violation." *Boulevard Associates,* 72 F.3d at 1039.

### B. The Principles Applied

As the finder of fact, I now apply the foregoing principles to the facts. In general, Raad has failed to convince me that Wal–Mart's actions were either "unfair" or "deceptive" under the Act. The six primary reasons for this conclusion are set forth in more detail in the following portions of this memorandum.[8]

First, Mr. Raad argues that Wal–Mart used a "bait and switch" sales tactic; that is, Wal–Mart agreed to sell double-pack Trico blades and instead delivered the cheaper Pylon single-pack blades. While such conduct would be both "unfair" and "deceptive" under Nebraska law, the facts do not support Mr. Raad's claim. There is no credible evidence that Wal–Mart made a promise to sell the Trico blades while intending to supply nonconforming goods of a cheaper character. Although a mistake was made, the evidence proves nothing more.

Second, Mr. Raad argues that Wal–Mart negligently misrepresented that it would sell and deliver the Trico double-pack blades, and instead negligently delivered the cheaper Pylon single-pack blades. Consequently, Raad argues that Wal–Mart's conduct was "unfair" and "deceptive." I am willing to assume that Wal–Mart acted negligently either because Ms. Hammond or someone else was not careful enough when they ordered the blades or because Ms. Hammond was negligent when she supervised the delivery of the blades to the cargo company.

However, this variation of the claim is nothing more than a restatement of Raad's breach-of-contract allegation. While an error was made, there is no evidence that Hammond or anyone else was anything but

---

8. In so doing, I do not intend to address every permutation of the plaintiff's claim. On the contrary, and for the sake of clarity and convenience, I address only the six major issues. As the fact finder, suffice it to state that I remain unconvinced by all the plaintiff's arguments.

ordinarily negligent. At all times until Raad discovered the error in Lebanon, Hammond believed that she had ordered and her store had received and delivered the correct blades.

The error most likely occurred because the Wal–Mart computer system was different than the SAM'S Club system, and because there was a misunderstanding between Ms. Hammond in Michigan and an order taker in Arkansas. When the goods arrived in Michigan, they were not described by name, but were described by number. This ambiguity made it doubly difficult for Hammond to discover the error.

Simply put, there is no evidence that Wal–Mart acted "unfairly" by breaching the contract in an aggravated manner. Moreover, there is no evidence that when Wal–Mart made the promise to deliver the Trico blades, Wal–Mart intended not to perform the promise. Consequently, there is no basis for concluding that Wal–Mart's actions, although negligent, were "deceptive."

Third, Mr. Raad asserts that Ms. Hammond "unfairly" and "deceptively" promised him that "everything was alright" when the blades were transferred to the cargo company in Michigan. Obviously, "everything was not alright." Once again, however, this argument is merely a reformulation of the breach-of-contract claim. Ms. Hammond believed what she told Raad. Nothing in the papers that Ms. Hammond possessed identified the name of the maker of the blades that were being delivered to the cargo company. Thus, Ms. Hammond had no obvious reason to suspect an error.

In addition, Ms. Hammond's willingness to deal with the cargo company, as opposed to requiring Raad to do so, was an accommodation to Raad. This assistance avoided Raad having to fly to Michigan on short notice to deal with the cargo company which was acting as his agent.

Because it is clear that Hammond believed the truth of what she told Raad and because she was trying to help him, it is impossible to conclude that Hammond's inaccurate telephone message was "unfair." While there

was a breach, it was certainly not aggravated.

Still further, there is also no evidence that Hammond ever intended *not* to perform her promise to deliver the Trico double-pack blades to the cargo company. Accordingly, Hammond's promise that "everything was alright," although inaccurate, was not "deceptive" within the meaning of Nebraska's consumer protection law.

Fourth, Mr. Raad argues that on April 29, 1996, Mr. Burford was "unfair" and "deceptive" when Burford told Raad that Trico blades were unavailable. For three related reasons, I am not persuaded by this argument.

Initially, the evidence convinces me that Trico double-pack blades, although still manufactured, were not available.[9] Consequently, Burford's statement was true. Moreover, Mr. Raad had not contracted to buy the single-pack blades which were available. As a result, Burford's statement was not deceptive since the issue was whether Wal–Mart would comply with Raad's demand that Wal–Mart supply him with conforming goods. Finally, on April 16, 1996, Hammond provided Raad with the same information that Wal–Mart had; that is, Sandy Brummett's investigation revealed that Trico single-pack blades were available, but the double-pack blades could not be obtained and Raad knew about this information because Hammond so informed him. (Hammond Dep. at 112:15–114:8; 182:5–183:19.) Therefore, Mr. Raad could not have been misinformed by Burford's April 29, 1996, statement.

When these three factors are considered, Burford's statement about the availability of the blades was not "unfair." For the same reasons, the statements were not "deceptive."

Fifth, Mr. Raad asserts that Mr. Burford was "unfair" when in various letters and phone conversations Burford refused to acknowledge that the error was Wal–Mart's fault. If viewed in isolation, some of Burford's statements and letters could be under-

9. When Sandy Brummett investigated, she learned, and informed Hammond who in turn informed Raad, that: "The double-pak (sic) was

especially made for Sam's Club domestically and [Trico] no longer has any in stock." (Hammond Dep. at 182:20–22.)

stood as an effort to "stonewall" Raad and thus they might be considered "unfair."[10] On the other hand, it is obviously not appropriate to view the evidence in isolation.

Wal–Mart rapidly acknowledged by its actions that it would take responsibility for the error. As soon as Mr. Raad called Ms. Hammond, she admitted the mistake. She immediately began to try to rectify the situation. Within approximately two weeks of discovering the error, Wal–Mart, through Mr. Burford, allowed Raad, and his customer, to keep the nonconforming goods, and additionally paid $20,550. When the evidence is viewed as a whole, there was nothing "unfair" about Burford's letters or conversations with Raad.

Sixth, Mr. Raad argues that Wal–Mart was "unfair" since it did not fully remedy the breach. According to Mr. Raad, Wal–Mart took advantage of the breach by forcing Raad to settle with Itani on terms that were damaging to Raad and relatively favorable to Wal–Mart. Mr. Raad argues that had Wal–Mart openly acknowledged responsibility for the error and supplied him with conforming goods (or equivalent cash), Wal–Mart would have paid more than $120,000 (the costs of conforming goods) plus shipping expenses instead of the mere $20,550 that Wal–Mart ultimately paid. Raad argues that he was held against his will in Lebanon, lost substantial profits and business opportunities, and was forced to pay additional monies, all because Wal–Mart would not fully remedy the breach, and instead paid only a token. For two related reasons, I am not persuaded by this argument.

Under some circumstances, the complete failure to remedy a breach of contract may be an "aggravating circumstance" justifying an "unfairness" finding. *See, e.g., Canady v. Crestar Mortgage Corp.,* 109 F.3d 969, 975–76 (4th Cir.1997) (under North Carolina law aggravating circumstances may exist in a breach-of-contract situation if "the defendant failed to make *any* 'offer of concession . . . .' ") (quoting *Barbee v. Atlantic Marine Sales & Serv., Inc.,* 115 N.C.App. 641, 446 S.E.2d 117, 121 (1994)) (emphasis added).

However, as the *Canady* decision makes clear, when the breaching party has made some concession, albeit an inadequate one, the courts are unwilling to find that the defendant's conduct was "unfair." *Id.* at 976 (following a breach of contract involving the purchase of a deed of trust, the failure to promptly return the purchase money after the error was discovered was not enough to impose consumer protection liability even though the defendant also wrongly refused to pay interest on the money it retained for eight months, thus forcing the plaintiff to file suit; the defendant had offered to refund the money without interest eight months after the error was discovered and before suit was filed).

Wal–Mart did not refuse to make a concession when it discovered the breach. On the contrary, and as earlier observed, Ms. Hammond promptly admitted the mistake, she immediately began to try to help Mr. Raad, and two weeks later Mr. Burford authorized a settlement that allowed Raad and his customer to keep the goods, plus receive a payment of $20,550 from Wal–Mart.[11]

Still further, after listening to the witnesses and examining the documentary evidence, I am convinced that Mr. Burford honestly believed that he had satisfied Mr. Raad. For example, the last contact that Burford had with Raad was by letter sending Raad the $20,550 check, which had been made payable to Raad at his request. The letter indicates that Burford thought the matter had been resolved to everyone's satisfaction. The letter concluded that: "As we have stated before, we do not know where the confusion or misunderstanding about this order occurred. We are glad that this can be resolved, in a timely manner." (Ex. 3.)

Consequently, although Wal–Mart did not fully remedy the breach when it agreed to the settlement, because it paid $20,550 plus allowing retention of the nonconforming goods and because Burford honestly thought this settlement had satisfied Raad, Wal–

---

10. Raad could not, however, have been "deceived" since he knew the truth. Moreover, Linda Hammond fully admitted to Raad that the error was Wal–Mart's fault.

11. For purposes of Raad's argument, I am willing to assume that the net cost to Wal–Mart of the $20,550 payment was $10,315. Nevertheless, the payment that Wal–Mart made was what Raad and Itani requested.

Mart's conduct was not aggravated. As a result, I find that the failure to fully remedy the breach was not "unfair."

## III. CONCLUSION

In summary, I have arrived at the following decisions. Since the Nebraska Consumer Protection Act does not define "unfair" or "deceptive," I must make an *Erie* "guess" about what Nebraska would do in this case. Next, I predict that Nebraska would apply the following four principles to the plaintiff's claim of "unfair" and "deceptive" conduct:

First, in order to prove an "unfair" practice when merchants have entered into a contract, the plaintiff must either prove that the practice: (1) fell within some common-law, statutory, or other established concept of unfairness or (2) was immoral, unethical, oppressive, or unscrupulous.

Second, in order to prove an "unfair" practice when merchants have entered into a contract, proof of a breach of contract is not sufficient. The plaintiff must additionally show that there were substantial aggravating factors associated with the breach, such as using the breach in an extortionate manner.

Third, in order to prove a "deceptive" practice when merchants have entered into a contract, the plaintiff must prove that the practice possessed the tendency or capacity to mislead, or created the likelihood of deception. Fraud, misrepresentation, and similar conduct are examples of what is prohibited.

Fourth, in order to prove a "deceptive" practice when merchants have entered into a contract, proof of a breach of contract is not enough. The plaintiff must additionally show that the promisor had no intent to perform the promise when it was made.

Finally, as the finder of fact, I do not believe that Wal–Mart's behavior was either "unfair" or "deceptive."

IT IS ORDERED that judgment shall be entered by separate document providing in part that judgment is entered for the defendant and against the plaintiff on plaintiff's Nebraska Consumer Protection Act claim, and the plaintiff shall take nothing on that claim.