[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: DEFENDANT SELVIDIO'S MOTION FOR SUMMARY JUDGMENT
The factual background to this case arises out of the arrest of the plaintiff. He had arranged for a wedding reception at a restaurant owned by the Selvidio defendants. Mr. Selvidio closed down the bar earlier than scheduled. The plaintiff questioned this and Mrs. Selvidio called 911; state troopers arrived and arrested the plaintiff for breach of peace and resisting arrest. He was later acquitted and brought this suit against the Selvidios and a trooper. Now the defendants, Anthony Selvidio and Ann Selvidio presently known as Ann Moore, have filed a motion for summary judgment against three counts of the complaint, the second count of malicious prosecution, the third count of loss of consortium and the sixth count alleging a violation of the Connecticut Unfair Trade Practices Act (CUTPA). The rules to be applied to motions of summary judgment are well known. If the court identifies a genuine issue of material fact it cannot decide it since parties are entitled to a trial CT Page 8192 by jury. If a claim is without merit and no genuine issue of material fact prevents the granting of such a motion, the court should do so in order to prevent the unnecessary time and money that a defendant would have to expend to defend a lawsuit that has no merit.
 1.
The tort of malicious prosecution as it applies to a claim like the one made here is recognized in Connecticut. In McHale v. W.B.S. Corporation,187 Conn. 444, 447 (1982), the court said:
 "An action for malicious prosecution against a private person requires a plaintiff to prove that: (1) the defendant initiated or procured the institution of criminal proceedings against; (2) the criminal proceedings have terminated in favor of the plaintiff (3) the defendant acted without probable cause; and (4) the defendant acted with malice primarily for a purpose other than that of bringing an offender to justice."
The thrust of the defendant's position in this motion is that they did not initiate or procure the criminal proceedings against the plaintiff. As their argument goes, from this it follows that, as the Selvidios played no part in this decision to arrest the plaintiff Walter Ford, they did not participate in the arrest of the plaintiff, it cannot be said that they acted without probable cause in the arrest of the plaintiff. In other words, they are not raising directly the issue of whether in fact there was probable cause to arrest Ford; they are saying the court should not reach this issue since they, the defendants, did not initiate the arrest or provide the police with false information leading to the arrest which, as will be seen, provides an alternative basis on which to conclude that the initiation of criminal proceedings requirement for this tort can be met.
Likewise, as to the malice requirement the argument seems to be that there is no allegation the incident was falsely reported so this cannot indicate malice and also it is argued that the defendants cannot be accused of maliciously prosecuting the plaintiff since "the Selvidios played no role in the decision to prosecute the plaintiff for his (the plaintiffs) actions," page 13 of 2/16/00 brief).
The court will now attempt to analyze McHale, particularly as it relates to the first element necessary to establish the tort of malicious prosecution. It should be noted that the McHale opinion referred to cases from other jurisdictions, the Restatement (Second) Torts § 653, and CT Page 8193 Prosser on Torts. The court will do likewise.
McHale specifically analyzed the initiation or first requirement for a malicious prosecution action. The court began its analysis of the initiation requirement by saying that the community has "an important stake in encouraging private citizens to assist public officers in the enforcement of the criminal law," id. p. 448. To foster this encouragement, there has been created a "limited immunity in the form of the first element that (a) plaintiff must prove to maintain his (or her) cause of action," id. p. 448. Thus, the court went on to say at the same page:
 "A private person can be said to have initiated a criminal proceeding if he has insisted that the plaintiff should be prosecuted, that is, if he has brought pressure of any kind to bear upon the public officer's decision to commence the prosecution. Fatone v. DeDomenico, 161 Conn. 576, 577, 290 A.2d 324
(1971); Zenik v. O'Brien, supra, 596. But a private person has not initiated a criminal proceeding if he has undertaken no more than to provide potentially incriminating information to a public officer."
The Zenik case appears at 137 Conn. 592 (1951). That case explores more fully the factual prerequisites for the initiation of prosecution requirements of a malicious prosecution action. There, tires were being stolen from a factory. The defendant apprehended the man who he thought was the thief and who had a tire in his possession. The police arrived at the scene and the poor plaintiff who was a security guard walked near the assembled group of the defendant, the police and the apprehended thief; "the defendant then accused the plaintiff of being implicated in the crime, saying to the officer and pointing to the plaintiff, `How about him? Aren't you going to take him? He's mixed up in this too!' The officer then requested that the plaintiff and the thief accompany him to the station. The plaintiff was arrested for breach of peace and the charges were nolled the next day," 137 Conn. at pp. 594-595. The Supreme Court refused to find error in a verdict for the plaintiff. It rejected the defendant's argument that the charges were not initiated by him and he had immunity in providing the information to the police. At page 596, the court said that the jury could have reasonably found that "the defendant not only expressed to the officer his opinion of the defendant's guilt but that he was also insistent that the plaintiff should be arrested for the crime. A person is deemed to have initiated a proceeding if his (or her) direction or request, or pressure of any kind by him (or her), was the determining factor in the officer's decision to commence the prosecution. . . . Regardless of the nature of the charge CT Page 8194 actually selected, the defendant's request might reasonably have been found to be the proximate and efficient cause of the arrest. It was the defendant who, by insistence, set the criminal law in motion. This fact was ample to render him responsible for instigating the proceeding."
In Fatone, the court upheld the trial court's denial of the plaintiffs motion to set aside the verdict in a malicious prosecution action. The court, in a per curiam decision, said, "There was no intimation in the evidence that the defendant expressed a desire that the plaintiff should be arrested, requested that the plaintiff be arrested or insisted upon it."It must be found that the private person's "direction or request or pressure . . . was the determining factor in the officer's . . . decision to commence the prosecution," 161 Conn. at p. 577.
What all of this really means is set forth in comment g of § 653 of the Restatement (Second) of Torts where, at page 409, it states:
 "A private person who gives to a public official information of another's supposed criminal misconduct, of which the official is ignorant, obviously causes the institution of such subsequent proceedings as the official may begin on his (or her) own initiative but giving the information or even making an accusation of criminal misconduct does not constitute a procurement of the proceeding initiated by the officer if it is left entirely to (the officer's) discretion to initiate the proceedings or not."
The mere making of an accusation which cites facts, identifies possible wrongdoers or even names names cannot without more be characterized as instituting the criminal proceedings — any other result would make the Restatement comment meaningless and defeat the very purpose of giving the citizen a limited immunity when it is to be decided if the citizen has in fact initiated prosecution. As McHale makes clear that purpose is to encourage private citizens to assist the police and not to interpret the law in such a way as to "have a chilling effect on the willingness of a private person to undertake any involvement in the enforcement of the criminal law," 187 Conn. at pages 448 and 449. If the citizen, acting in good faith, cannot name names or identify possible perpetrators, how could that encourage cooperation with law enforcement? This view of the implication of the Restatement language is not just supported by dicta in Connecticut cases. In Zamora v. Creamland Dairies, 747 P.2d 923, 927, 928
(N.M., 1987), the court held that merely telling authorities that an employee had possibly committed a crime does not constitute the CT Page 8195 institution of criminal proceedings; "the mere act of calling the police does not rise to the level of instituting criminal proceedings," id. page 928.[1]
There is an important qualification that must be added to the foregoing observations.
One important factor in analyzing the first element of malicious prosecution must now be referred to. Even if the private person did not insist on the arrest or pressure the officer to make the arrest that person can still be found to have initiated or procured the prosecution and the first element is satisfied if he or she knowingly gave information that is false. As is said in comment g of the Restatement this must be so because "the exercise of the officer's discretion makes the initiation of prosecution his (or her) own and protects from liability the person whose information or accusation has led the officer to initiate the proceedings." As said at 187 Conn. p. 449, by McHale: "[f]alse information necessarily interferes with the intelligent exercise of official discretion."
To summarize the law as it applies to the first element of a malicious prosecution action — whether the defendants initiated or procured the criminal proceedings — a 1985 Massachusetts case says the following:
 "In order to charge a private person with responsibility for the initiating of proceedings by a public official, it must therefore appear that his desire to have the proceedings initiated expressed by direction, request or pressure of any kind was the determining factor in the official's decision to commence the prosecution or that the information furnished by him upon which the official acted was known to be false." Ziembreu v. Fo'cs'le, 475 N.E.2d 1223.
What does all of this say then concerning the central arguments the defendants make which concentrates on whether or not they can be said to have initiated or procured the criminal prosecution? Did the defendants bring any pressure to have the charges filed or did they insist that an arrest be made? or to put it another way, was it left entirely to the officer's discretion as to whether or not to prosecute the plaindff? After trying to analyze this problem, the court will address the question as to whether the information given was false or did not constitute a full and fair disclosure. The court has examined the criminal trial testimony of the Selvidios, their affidavits, including two from Ann Selvidio, the deposition testimony of the plaintiff and the affidavit of CT Page 8196 Trooper Barnes who made the arrest.
 (a)
Relying on the earlier discussion the court cannot conclude that the defendants initiated or procured the prosecution by insisting on the plaintiffs arrest or bring any pressure on the officers to arrest him. That was left to Trooper Barnes' discretion as he attests to in his affidavit. The defendant Ann Selvidio simply called 911 to claim there was an altercation, she did not identify the plaintiff in that conversation. Then and at no later point did she or the defendant Anthony Selvidio insist or even request that the plaintiff be arrested. When the troopers arrived at the restaurant she admitted in her second affidavit that she did point to the plaintiff and say "there's the problem." This contradicts an earlier affidavit in which she said she pointed to both the plaintiff and Anthony Selvidio to tell the trooper there was a problem. But this in and of itself does not create d genuine issue of fact. It merely boils down to a factual scenario in which Ann Selvidio in effect tells the trooper before he approaches the plaintiff — yes, there's an altercation here and the plaintiff Ford is the cause of the altercation or problem.
That without more cannot constitute instituting a criminal prosecution where the citizen does not insist on an arrest, put pressure on the police to make an arrest or even request an arrest. In fact, it would contradict the holding in McHale, which, at 187 Conn., page 449, approved of and quoted the holding of an earlier case which held a malicious prosecution action would not lie against someone who "fully and fairly states all the material facts within his (or her) knowledge to the prosecuting attorney and in good faith abides by [the prosecuting attorney's] decision as to whether they constitute probable cause for believing that a crime has been committed. . . ." Brodrib v. Doberstein,107 Conn. 294, 298 (1928). It is a separate question whether there was full and fair disclosure here, but there was no evidence that in merely calling the police the Selvidios instituted prosecution by putting on pressure on the troopers to make an arrest or insisting on such, thereby overriding and controlling the officer's discretion.
 b.
Was false information provided to the police so that they could not exercise their discretion intelligently — if so, the prosecution can be said to have have been procured or initiated by the defendants. Discussing the Restatement and comment g of § 653 which the preceding sentence refers to, a Missouri court gives a broad reading to "false information" — it is not just the giving to information known to be CT Page 8197 false, it is failure to give full information.
There, the court discusses the institution of prosecution requirement and referring to the defendant in a malicious prosecution action said that her "recitation of inaccurate and incomplete facts and the misstatement and omission of facts are sufficient to find that she instigated the prosecution against plaintiff. . . ." Ladeas v. Carter,845 S.W.2d 45, 51 (Mo.App., 1992). This observation is similar to the language in our Brodrib v. Doberstein case which protects a person from malicious prosecution liability where the person "fully and fairly statesall the material facts" and leaves the decision to initiate criminal proceedings to law enforcement, 107 Conn. at page 298, previously quoted, emphasis by this court:
Did the Selvidios, particularly Ann Selvidio, give false information to the police? From the little that has been provided to the court, all Selvidio said when she called 911 is that there was an altercation and when the trooper came into the restaurant she pointed to the plaintiff and said there's the problem — indicating to a reasonable observer that the plaintiff was responsible for the altercation.
Was there an altercation, was the plaintiff responsible for it? Both the Selvidios said that after the bar was shut down, the plaintiff Ford became very upset, he yelled very loudly, Ann Selvidio said he used profanities, he was chest to chest with her husband while this was transpiring. He might have been drunk. Ballentime's Law Dictionary, 3d Ed. defines an altercation as "a controversy; dispute, or quarrel waged in anger." All of this sounds very much like an altercation or disturbance and seems to fit the definition of Breach of Peace, §53a-181, which states that "A person is guilty of breach of the peace when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof he (sic): (1) engages in fighting or in violent or tumultuous or threatening behavior in a public place; . . . (5) in a public place, uses abusive or obscene language or makes an obscene gesture. . . ." A restaurant is a public place, the language used was obscene or at least that is for the jury to decide and what happened as initiated, according to the Selvidios, by Ford was "tumultuous." From this, it cannot be said that the description of the incident as an "altercation" initiated by Ford was a false communication to the police.
The difficulty with granting the motion for summary judgment is presented by the deposition of Mr. Ford that was submitted by the defendants. Ford said he had not been drinking and did not yell at Mr. Selvidio — he raised his voice, but only because the bar area was noisy and Selvidio was across from him in that area. The plaintiff Ford also said he did not use profanities — in fact, he never swears. If CT Page 8198 Ford's story is to be believed, there was no disturbance or altercation. In the context of a "911" call asking for immediate police assistance, full and fair disclosure might very well have required Selvidio to have said that an argumernt is going on but no one is being threatened. No profanities are being used and no one is yelling — that is Mr. Ford's story which the jury has a right to believe if it so chooses.
As it is, according to the plaintiff, the police stormed in and almost immediately sprayed him with mace. This rebuts another contention of the defendants that they could not have initiated the criminal proceedings since the trooper based his arrest on his own observations of Ford after he entered the restaurant. Ford was arrested for breach of peach and resisting and the manner in which he describes his arrest immediately after police entry could permit the jury to conclude that his arrest was due to the information — or failure to give information by Ms. Selvidio.
The court concludes there is an issue of fact on the question of whether the Selvidios initiated the prosecution.
For the same reasons as just discussed, the court cannot conclude that the defendant's actions in having Ford arrested were protected by the mantle of probable cause. See McHale, at 187 Conn. 447. As the defendants note: "The propriety of the defendant's conduct is causing the arrest of the plaintiff is to be tested by the facts as they appeared to be at the time the prosecution in question was instituted." Shea v. Berry,93 Conn. 475, 477 (1919). The defendants in their argument assume that the Selvidios and Trooper Barnes will be believed, especially that portion of the Barnes affidavit which indicates he saw Ford committing a breach of peace and resisting arrest. The defendants argue again that this evidence will just have to be believed by the jury. But Ford's deposition as noted states the troopers ran into the restaurant, pepper sprayed him and then arrested him for breach of peace. The jury could well believe Ford's account — a criminal jury, admittedly with a higher proof standard, after all acquitted Ford of all criminal charges. If Ford is to be believed, when do the facts justifying the breach of peace arrest arise for probable cause purposes? If the police acted posthaste without making any of the observations they claim, as Ford's deposition testimony suggests, then they had to have acted only upon the Selvidio "911" call. If that is so, genuine issues of material fact arise as to the probable cause for Ford's breach of peace arrest. Perhaps more to the point it is difficult for the court to resolve this question because it is not clear what the breach of peace arrest was for — was an information filed, a bill of particulars, what was the proof at trial, did some of the alleged conduct on which the breach charge was based arise before police entry into the restaurant? From the portions of CT Page 8199 the criminal trial transcript submitted to the court the very skilled criminal lawyer who represented Ford and secured an acquittal for him wasted a lot of his time cross examining the Selvidios about pre-police arrival activity if that activity did not figure in all the activity subject to the jury's review at the criminal trial on the issue of Ford's guilt or innocence of the breach of peace charge.
The defendants also argue that the defendants did not act with malice toward Ford when Ann Selvidio called the police to make her "91 "complaint.
A necessary element of malicious prosecution is that "the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice." McHale v. W.B.S. Corporation, 187 Conn. 444, 447
(1982).
The defendants argue no malice has been shown here; the plaintiff to show malice alleges that the incident was falsely reported — Ann Selvidio reported a disturbance as being dangerous. The plaintiff also claims Selvidio failed to tell the police the "disturbance" was over and maliciously prosecuted the plaintiff. See paragraph 28 of count two of the complaint. Again, the defendants persist in viewing the documents presented to the court on summary judgment only in a light most favorable to their position. As previously discussed, there may not have been false reporting as such, but there is a genuine issue of material fact based on Ford's deposition as to whether or not there was "full and fair disclosure" to the state police on the question of whether the disturbance was "dangerous" and in fact required police intervention. Section 668, comment f, of the Restatement (Second) Torts, in discussing the malice requirement which the Restatement defines as "Propriety of Purpose," says that "one who initiates the (criminal) proceedings cannot do so for a proper purpose if his (sic) real purpose is to harm the accused because of spite, ill will or personal hostility . . ." Again, if Ford's deposition testimony is to be believed, failure to make full disclosure in describing an incident in a "911" call may indicate ill will when the subject of the disclosure is disputing a decision to close his wedding reception down earlier than agreed to with the very people who make the call.
Furthermore, § 669 of the Restatement says that "[l]ack of probable cause for the initiation of criminal proceedings insofar as it tends to show that the accuser did not believe in the guilt of the accused, is evidence that (the accuser) did not initiate the proceedings for a proper purpose." As discussed previously, there is a genuine issue of material fact as to whether the proceedings were "initiated" by the Selvidios for failure to make full and fair disclosure. That being the case, at what CT Page 8200 point should the probable cause determination be made? If the allegations of the complaint supported by Ford's deposition testimony are accepted, then the determination is to be made at the time Selvidio called the police and the conduct of the parties up to the time the police entered the restaurant. Ford's version of events which the jury would have a right to credit is that the police barged into the restaurant and, upon being pointed out, the troopers pepper sprayed, handcuffed and arrested him. This belies any notion that the criminal proceedings were initiated based on observations made by the trooper after he entered the restaurant. That being the case, there is certainly an issue of fact as to whether there was sufficient probable cause to "initiate criminal proceedings against the plaintiff. "And under the Restatement and our case law, malice may be inferred from the want of probable cause,"Brodrib v. Doberstein, 107 Conn. 294, 299 (1928); Thompson v. BeaconValley Rubber Co., 56 Conn. 493, 496.
The motion is denied as to the malicious prosecution allegation of the second count.
 2.
In light of the court's decision on the malicious prosecution count the court will not grant the motion for summary judgment on what is a derivative loss of consortium claim. Izzo v. Colonial Penn Ins. Co.,203 Conn. 305, 312 (1987). Ann Selvidio's claim is "inextricably attached to the claim of the injured spouse." Ford, id. If his claim is not subject to dismissal at this point neither is hers.
 3.
The plaintiff also makes a claim under the Connecticut Unfair Trade Practices Act, § 42-110a et seq. of the General Statutes (CUTPA). From the complaint and the materials submitted to the court pursuant to this motion for summary judgment, the CUTPA claim is based on a breach of contract allegation set in the context of the facts and events that surround and led to the malicious prosecution allegation.
The defendant argues that a simple breach of contract claim cannot support a CUTPA action and "a single transaction which is me rely incidental to the defendant's business cannot support a claim for a CUTPA violation." To discuss the last argument first, the defendant cites numerous cases at the superior court and federal court district level which stand for the proposition that a defendant's actions which are incidental to the conduct of its true business do not fall within the meaning of trade or commerce for the purposes of CUTPA. See, for example, Arawana Mills Co. v. United Technologies Corp., 795 F. Sup. 1238, CT Page 8201 1255 (D.Conn. 1992) and Abely Waste Oil v. Ravenswood DevelopmeptCorp., 15 Conn.L.Rptr. 562 (1995). The defendants then argue that the act of reporting an incident to the police or seeking police intervention is not the business of the defendants and the act of reporting a disturbance was merely incidental to their business of running a restaurant. The "single transaction" of reporting a disturbance will not support a CUTPA claim. The argument framed this way has merit, but the plaintiffs CUTPA claim cannot be fairly or completely characterized in the way the defendants have sought to do so.
The plaintiff rather appears to claim that the nature of the contract he had — for his wedding reception — was such that breach of it has to constitute a CUTPA violation. That is, the very breach of such a contract "constitutes an affront to the public policy supporting the union of a man and woman in marriage, the foundation of our civilization," see page 9 of plaintiffs March 3, 2000 brief; Carabettav. Carabetta, 182 Conn. 344, 351 (1989), is cited for the proposition that the policy favoring marriages is sufficiently strong to justify upholding an unlicensed ceremony. It is further argued on the same page that the "wedding reception . . . is an integral part of the marriage ceremony for any couple" — no case is cited for that proposition, however.
But the plaintiff's claim does not rest merely on the nature of the contract as such; the plaintiff also appears to place the breach of contract claim within the context of all the actions and events surrounding the malicious prosecution allegation and argues that in that context the breach of contract would constitute a violation of CUFPA.
Langer, Morgan and Belt, in their Connecticut Unfair Trade PracticesAct, Vol. 1, at § 4.3, pp. 114 et seq. contain an excellent discussion of this problem. The law in this area is summed up at page 116 where it is said: "A number of lower court decisions have held that a simple breach of contract does not violate CUTPA. . . . The difficulty has been in describing what conduct in addition to the breach is necessary to establish a CUTPA violation. A standard that a number of superior court decisions have used to describe unfairness is that the claimant must plead and prove `substantial aggravating circumstances attending the breach.'" See Foley v. Huntiunton Co., CV87-246 145S, 1994 Lexus 765 (J.D. Fairfield), for latter proposition; for cases supporting proposition that simple breach of contract claim cannot support CUTPA claim. See Emlee Eciuip. Leasing Corp. v. Waterbury Transmission, Inc.,41 Conn. Sup. 575 (1991). See also Boulevard Associates v. SovereignHotels, Inc., 72 F.3d 1029, 1039 (CA.2, 1995), interpreting CUTPA.
The court will now analyze the arguments made by the plaintiff in CT Page 8202 behalf of its CUTPA claim. The court cannot accept the plaintiffs claim that merely because the contract here involved a wedding reception its breach requires a holding that there has been a CUTPA violation. It would open a Pandora's box if judges could, apparently on their own whim, classify types of contracts as peculiarly sympathetic, and on the basis of that classification, conclude that certain contracts when breached, automatically set forth a CUTPA claim.
For example, every person's home is that person's castle, to modify an old adage. Does that mean every contract involving purchases for the home is subject to CUTPA protection where there is a breach? If plaintiffs argument is accepted, every contract dispute over wedding arrangements and perhaps a whole variety of other personal activities would be converted into a CUTPA violation. As said in another context by Judge Calabresi, it cannot be assumed "that the Connecticut legislature, in enacting CUTPA, intended such an extraordinary alteration of the common law." Boulevard Associates v. Sovereign Hotels, Inc., 72 F.3d 1029, 1039
(CA. 2, 1995). One court has said: "In a sense, unfairness inheres in every breach of contract when one of the contracting parties is denied the advantage for which (that party) contracts, but this is why remedial damages are awarded on contract claims." United Roasters, Inc. et al v.Cohiate-Palmolive Co., 649 F.2d 985, 992 (CA. 4, 1981). In a claim like this involving the breach of a contract for very cherished purposes the law already provides for damages going beyond the merely remedial. Section 353 of the Restatement (Second) Contracts provides that emotional distress damages may be awarded where "the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result." Thus, there is no reason to provide a CUTPA remedy automatically for breaches of contracts of this type.
The plaintiffs other argument is more compelling — a CUTPA violation should be found given the context of the breach in the malicious prosecution setting. Again, giving the facts that inference most favorable to the plaintiffs case, it could be said that Ford's contract for a wedding reception was breached by these restaurant owners and his conversation with Mr. Selvidio, before the police arrived, was merely an attempt by him to try to have Selvidio change his mind and allow the reception to go on — he had paid, all the guests were there for the reception, he had performed his part of the bargain and he, Ford, was merely trying to induce Selvidio to live up to his part of the bargain under circumstances wherein Ford felt Selvidio had no right to break his agreement to provide for a wedding reception. But while these discussions were going on, lo and behold, the police came and arrested Ford based on the fact that Ann Selvidio made a "911" call in response to overhearing the Ford-Selvidio discussion she, according to Ford's version of events, did not make a full and fair disclosure to the CT Page 8203 police about what was going on between her then husband Selvidio and Ford.
In some respects, this case is similar to or raises issues comparable to a case previously decided by the court in James Doe, et al v. JuliaDay Nursery, Inc., CV98-0062198S (Ansonia/Milford J.D., 1998). In that case, the court allowed a CUTPA claim to stand in the face of a motion to strike where the complaint alleged that parents, who had their children in a day care facility, became concerned about the quality of care. They wrote a letter raising these concerns to the staff and the facility's president. The complaint went on to allege that in retaliation, the defendant facility "maliciously, in bad faith and without reasonable cause, filed a complaint with the Department of Children and Families falsely accusing the parents of sexually abusing their children.
In that case, the court discussed the method by which a court is to determine if an unfair trade practice has occurred. It was noted that the legislature explicitly said that our courts should be guided by interpretations given by the Federal Trade Commission to the federal Unfair Trade Practice Act, 15 U.S.C. § 45a(1). Early on, our court adopted the so-called "cigarette rule," created by the FTC, Atlantic RichfieldCo. v. Canaan Oil Co., 202 Conn. 234, 239 (1987). This court noted that the problem with the cigarette rule on the state level is that it provides only "abstract guidance for resolving individual cases." See Langer work, Vol. 1, Chapter 2, page 12. In the federal system, the FTC does not apply the rule as an abstract test to the whole of economic or life activity affecting consumers and how they are dealt with at any point by people with whom they have entered commercial relationships. The FTC has identified only four areas of activity which it deems unfair: (1) withholding material information; (2) making unsubstantiated advertising claims; (3) using high pressure sales techniques; and (4) depriving customers of various post purchase remedies. A-G Food, Inc. v. PepperidgeFarms. Inc., 216 Conn. 200, 218 (1990); American Financial Services v.FIZ, 767 F.2d 957, 979 (CA. D.C. 1985). It is upon that substratum of cases that the FTC applies the cigarette rule.
The facts of this case do not of course fall directly within category (4) which has just been referred to — Ford still had his contract remedies for the claimed breach and if the Selvidios' story and Trooper Barnes are accepted, his actions went beyond trying to rationally settle a contract dispute. But, again, if Ford's story is accepted by the trier of fact similar problems sought to be addressed by the FTC with category (4) are raised. Thus, for a short amount of time after being informed of Selvidio's intention not to honor his contract commitments, he, Ford, tried in a rational and relatively calm manner to resolve the dispute under the contract and convince Selvidio to live up to his contractual CT Page 8204 obligations. This is a highly unusual case, but as a general proposition, a rational and fair market place would seem to require that consumers faced with a declared intention to and actions that in effect breach a contract should have a reasonable time under all the circumstances to try to resolve the problem leading to the breach and convince the other side to go on with the contract.
From Ford's version of events, he was trying to do that and the Selvidios put a halt to his efforts to calling in the police when there was no reason to and the police arrested him — if his version of events is given their most favorable inference — solely on the Selvidios' unsupported claim (see previous discussion in malicious prosecution section).
Although the court could find no case like this one, if Ford's story is to be believed the Selvidios' actions would constitute a sufficient aggravating set of circumstances to permit what would be an otherwise simple breach of contract claim to be treated as a CUTPA violation. In other words, it could be inferred that the motive of the Selvidios was to terminate Ford's reasonable attempt to resolve a contract dispute by very egregious means — making an unnecessary communication to the police not fully disclosing the circumstances leading to the call, all of which resulted in the plaintiffs arrest.
This is not to say the plaintiff will prevail. If the Selvidios' version of how Ford was behaving prior to the police arrival is believed, his actions certainly would not be entitled to CUTPA protection. If Trooper Barnes' version of events is accepted, then the arrest was not prompted necessarily by any factual communication from the Selvidios so query if a CUTPA violation could be found.
But if the above-referred to version of events by Ford is accepted and permissible inferences are drawn therefrom, then a CUTPA violation could be found because the requirements of the cigarette rule seem to be met. As to category (2) the actions of the defendants could be found to be oppressive and such activity would cause substantial injury to consumers if they are not allowed a reasonable time to work out or settle contract disputes. As to category (1) could it not be argued that public policy requires this reasonable time so that contract disputes can hopefully be resolved without requiring court intervention and that this reasonable time not be truncated by resort to the "911" system in an inappropriate manner.
As to category (3) of the cigarette rule, "substantial injury" can be claimed to have been inflicted on the consumer. As Langer notes, in extreme cases where tangible injury is shown, emotional distress could be CT Page 8205 considered to support a finding of unfairness, Vol. 2, Appendix J, fn. 16, page 268. Here, the plaintiffs wedding reception was terminated — a reasonable ground to claim emotional distress. In describing substantial injury — a prerequisite of category (3) of the cigarette rule — the FTC said that such injury must not be outweighed "by any offsetting consumer or competitor benefits." The court can ascertain no benefit in encouraging people to make "911" complaints, such as made here under Ford's version of events. See James Doe. et alv. Julia Day Nursery, supra, to general discussion of this portion of the cigarette rule.
In any event, based on the foregoing, the court will deny the motion for summary judgment as to the CUTPA count.
Corradino, J.